## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## COLUMBUS DIVISION

| | | |
|---|---|---|
| JEFFREY R. WILSON | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION FILE NO. 2:14-cv-2316 |
| v. | : | |
| | : | |
| ROBERT R. BAHNSON, | : | |
| GEOFFREY N. BOX, | : | |
| ANDREW M. THOMAS and | : | |
| THE OHIO STATE UNIVERSITY | : | DEMAND FOR JURY TRIAL |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Jeffrey R. Wilson ("Wilson") hereby states his complaint for defamation, tortious interference with contract, intentional infliction of emotional distress, unlawful discrimination pursuant to 29 U.S.C. § 2615, unlawful employment practices in violation of title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.§ 2000e et seq. ("Title VII"),  O.R.C. § 4112.02 et seq., punitive damages, attorneys' fees and injunctive relief against Defendants Robert R. Bahnson ("Bahnson"), Geoffrey N. Box ("Box"), Andrew M. Thomas ("Thomas") and The Ohio State University ("Ohio State") as follows:

### THE PARTIES

1.  Plaintiff Wilson is a resident and citizen of the State of Pennsylvania.

2.  Wilson is a medical doctor who worked as a resident urologist at Ohio State at various medical facilities in Columbus, Ohio from on or about July 1, 2009 to June 30, 2014.

3.  Defendant Bahnson is a resident and citizen of the State of Ohio at 2635 Asbury Dr., Columbus, Ohio 43221.

4.  Bahnson is a medical doctor who works as an attending urologist at Ohio State at various medical facilities in Columbus, Ohio.  At all relevant times, Bahnson has held the positions of Chairman of the Department of Urology and Professor of Urology at Ohio State.  Prior to 2011, Bahnson held the position Director of the Residency Program for the Ohio State Department of Urology.

5.  As an attending urologist, Director of the Residency Program, and Chairman of the Department of Urology, Bahnson maintained a supervisory position over Wilson while he worked for Ohio State.

6.  Defendant Box is a resident and citizen of the State of Ohio at 1127 Neil Ave., Columbus, OH 43201.

7.  Box is a medical doctor who works as an attending urologist at Ohio State at various medical facilities in Columbus, Ohio.  At all relevant times, Box has held the positions of Assistant Professor of Urology at Ohio State.  In 2011, Bahnson and Ohio State appointed Box as Director of the Residency Program for the Ohio State Department of Urology.

8.  As an attending urologist and Director of the Residency Program, Box maintained a supervisory position over Wilson while he worked for Ohio State.

9.  Defendant Thomas is a resident and citizen of the State of Ohio at 4516 Amity Rd., Hilliard OH 43026.

10. Thomas is a medical doctor who serves as Chief Medical Officer for The Ohio State University Wexner Medical Center. As Chief Medical Officer, Thomas has supervision and control over Bahnson and Box.

11. Defendant Ohio State is an Ohio public university located in Columbus, Ohio. Ohio State supervises and controls Bahnson, Box, and Thomas as their employer.

## JURISDICTION AND VENUE

12.  This Court has personal jurisdiction over Bahnson, Box, and Thomas because they are citizens of Ohio who reside and transact business within the Southern District of Ohio.

13. This Court has personal jurisdiction over Ohio State because its principal place of business is located in the Southern District of Ohio.

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (diversity) by virtue of the diversity of citizenship of the parties.

15. The amount in controversy in this case, exclusive of interest and costs, exceeds $75,000.00.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 42 U.S.C. § 2000e-(5)(3).   A substantial part of the unlawful employment practices giving rise to the claims occurred in this District, as well the employment records relevant to such practice are maintained and administered in this District.

17. Plaintiff brings this action pursuant to 29 U.S.C. § 2617 for violations of 29 U.S.C. § 2615.

18. Plaintiff brings this action pursuant to 42 U.S.C. § 1981a for violations of 42 U.S.C.§ 2000e–2 and 42 U.S.C.§ 2000e–3.

19. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f)(3) and principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

20. On or about October 15, 2014, Plaintiff filed a charge of discrimination against Defendants with the United States Equal Employment Opportunity Commission ("EEOC").  On or about October 23, 2014, at Plaintiff's request, the EEOC issued Plaintiff a notice informing him of his right to sue under Title VII, which was received October 25, 2014.   Plaintiff has thus

complied fully with all prerequisites required by Title VII.

**FACTS**

**A.**   **Background**

21.  Wilson obtained his doctorate degree in medicine from the Ohio State College of Medicine in the spring of 2009.

22. Before a medical doctor can independently practice medicine in the United States, he must complete a "residency" at an accredited program for a specific field of medicine.

23. On or about July 1, 2009, Wilson was employed at Ohio State in the Department of Urology as a resident medical doctor. Wilson's job duties while working at Ohio State included treating and caring for patients while being trained in the field of urology by attending urologists and senior resident urologists.

24. The urology residency at Ohio State was a five year program.  After completing five years of training and meeting certain requirements, resident urologists "graduate" the program which enables them to practice urology independently.

25. Once a urology resident graduates from the program, he may apply for additional credentialing known as board certification.

26. To become "board certified," the graduated physician must show he is qualified by taking exams known as the "boards." The boards include written and oral examinations.  The successful completion of the boards includes two parts.  Part one is a written, multiple choice test taken within a month of residency completion, and part two is an oral examination taken one and a half years after residency completion.  Part one must be completed with a passing score, before part two is taken.

27. Before a graduated physician can take part one of the boards, he must submit a notarized

application with supporting documents, a $1,300.00 fee, and a letter from his Director of the Residency Program confirming his completed residency status.

28. Part two of the boards includes another similar fee and letter from the Residency Program.

29. Board certification is held in considerable esteem in the field of medicine. Board certification is an extra qualification recognized by the field that is valued by the public in choosing medical doctors and can positively affect a physician's reputation and income earning ability.

30. Board certification, or at least eligibility to become board certified, is normally a requirement for certain employers in the medical field.

31. At the time Wilson began his employment at Ohio State, Bahnson was the Chairman of the Department of Urology and the Director of the Residency Program ("Residency Director") for the Ohio State Department of Urology.

32. As Chairman, Bahnson had the highest level of authority in the Department of Urology. All attending physicians, resident physicians, and staff in the Department of Urology were under the supervision and control of Bahnson.

33. As Residency Director, Bahnson was responsible for training and educating resident physicians in the Department of Urology. Furthermore, the Residency Director is responsible for graduating and credentialing resident physicians.

34. The Residency Director must truthfully attest as to whether a resident physician has met the requirements to be credentialed as an urologist. An affirmative statement is required for a resident physician to sit for the urology boards.

35. Disputes with the Residency Director were to be raised with the Chairman. As Chairman

5

and Residency Director, Bahnson was the sole decision-maker on the graduating and credentialing of resident physicians in the Department of Urology.

36. At the time Wilson began his employment at Ohio State, Box was an Assistant Professor of Urology.

37. In 2011, Bahnson was removed the position of Residency Director due to misconduct and complaints to the Accreditation Council for Graduate Medical Education ("ACGME").

38. In spite of this misconduct and complaints to the ACGME, Ohio State enabled Bahnson to choose his successor as Residency Director.

39. On information and belief, Bahnson attempted to appoint his wife Janet McGarr as Residency Director.

40. Mrs. McGarr is an internal medicine doctor with an inactive license to practice medicine in Ohio since 2004.  She is not trained in the field of urology.

41. Bahnson was unsuccessful in appointing Mrs. McGarr as Residency Director.

42. As an alternative, Bahnson appointed Box as Residency Director.  Box assumed the position of Residency Director shortly afterwards.

43. Other candidates expressed interest in becoming the Residency Director at the time, but were not seriously considered for the position.

44. During the time Wilson was employed at Ohio State, Thomas was the Medical Director of Ohio State's main University Hospital, and he was Associate Dean for Graduate Medical Education for Ohio State's College of Medicine. In 2013, Thomas was promoted to Chief Medical Officer for The Ohio State University Wexner Medical Center. The Chief Medical Officer is the senior medical officer for the medical center, overseeing patient-care services.

**B.**     **Investigation by Ohio State.**

6

45. After being informed of Wilson's claims in this lawsuit, Ohio State conducted an investigation based on written complaints by Wilson to the American Board of Urology, the ACGME, and the State Medical Board of Ohio. The Case Report was completed September 12, 2014. A true and accurate copy of the Case Report is attached hereto and incorporated herein as Exhibit A.

46. The Case Report conclusively found:

- Witnesses' testimony substantiated the allegations that Bahnson has made direct or implied threats to members of the Department of Urology;

- By making threats about future employment, recommendation letters, and taking paternity leave, Bahnson has behaved in a way that is in conflict with Ohio States' values of Integrity, Openness and Trust, and Empathy and Compassion;

- Investigators found that there is a pervasive fear in the Department of Urology that Bahnson will follow through on his threats. There is a culture of fear and intimidation in the Department of Urology;

- There is sufficient evidence that Bahnson's behavior is consistent with a hostile work environment, which exists when an employee experiences workplace harassment and fears going to work because of the offensive, intimidating. or oppressive atmosphere generated by the harasser;

- The mechanisms in place through the Residency Program to protect residents did not function as intended;

- The impact of Box's lack of authority as Residency Program Director is that there has been no buffer between residents and Bahnson's intimidating behavior;

- Witness testimonies substantiate the allegation that Bahnson made physical

7

contact in a threatening manner with a former resident. This type of behavior is a direct violation of university policy and is unacceptable. Based on the witnesses' testimony of direct and implied threats, physical contact of an aggressive nature and intimidation that has disrupted the work environment in the Department of Urology, the conclusion of the investigation is there is a finding of sufficient evidence of a policy violation as it relates to the university's Workplace and Family and Relationship Violence Policy 7.05;

- The witness testimonies substantiated the allegations that Bahnson engaged in harassment by making multiple comments relating to national origin;

- The conclusion of the investigation is there is a finding of sufficient evidence of a policy violation as it relates the university's Affirmative Action, Equal Employment Opportunity and Non-discrimination/Harassment policy 1.10;

47. The Case Report contained many witness statements regarding the misconduct of Bahnson, Box, and Thomas.

48. The Case Report and witness testimony was selected and edited in a manner to lessen Ohio State's civil liability to Wilson and others.

## C.     Misconduct by Bahnson.

49. From at least July 2009 to July 2014, Bahnson used his positions as Chairman and Residency Director to cultivate a culture of fear, intimidation, discrimination and retaliation in the Ohio State Department of Urology.  Ohio State was aware of  and  has permitted Bahnson to commit these acts for years without meaningful repercussions.

### i.     Paternity leave threats.

50. In 2010, Bahnson stated he "eliminated" paternity leave for male resident urologists.

8

Ohio State's paid leave policy (Policy 6.27) states that eligible fathers are entitled up to three weeks of paid leave to care for and bond with a newborn or newly adoptive child. Policy 6.27 explicitly states, "Parental leave is a benefit of employment and its use must not have a negative impact on employment status or opportunities."  Furthermore, the policy states, "Parental leave must be exhausted prior to the use of vacation leave or compensatory time when such leave is requested for the purpose of a birth or adoption event."

51. When male resident urologists attempted to take paternity leave, Bahnson would send the requesting male an email stating "please see me." During these "please see me" meetings, Bahnson would threaten and verbally abuse the requesting male urologists.  His statements included "good surgeons don't take paternity leave," that he "eliminated paternity leave" and he will reduce everyone's vacation from three weeks to two weeks if too many residents take paternity leave.  Moreover, Bahnson stated he would, if possible, "extend" the requesting males urological training in retaliation for taking paternity.  Bahnson made thinly veiled threats stating he will not believe males are "competent surgeons" if they take paternity leave, and that they should remember he signs their certificates of graduation at the end of training, which are necessary for taking the boards.

52. It is an unwritten rule among residents that Bahnson despised paternity leave, so when a resident urologist requests paternity leave, Bahnson sends a request for the resident to see him in his office.

53. Wilson personally received these above threats when he requested paternity leave before the birth of his first child in June 2011.  Bahnson intimidated Wilson by threatening his ability to practice medicine.  Wilson discussed with Bahnson that federal law protects his right to take paternity leave at Ohio State.  This discussion angered Bahnson, who issued additional threats.

9

In response to all of the threats, Wilson did not take paternity leave for his first child. Instead, Wilson used a week of vacation to care for his wife and child.

54. Bahnson explicitly told Wilson on several occasions he is the person to sign off on all future hospital credentialing, and the one to permit Wilson to sit for the urology boards.

55. As punishment for Wilson requesting paternity leave he was entitled to take, Bahnson directed negative evaluations of Wilson shortly thereafter, despite the same quality of work.

56. In 2014, Wilson and another resident urologist Andrew Smock separately requested one week of paternity leave for the births of their second children in April and May.

57. Bahnson sent Wilson and Dr. Smock "please see me" emails in the same week, for the purpose of instructing them not to take paternity leave. Wilson did not attend the meeting because of intimidation. Smock attended the meeting. Bahnson told Smock he would eliminate a week of vacation for every resident from three weeks to two weeks, if residents took paternity leave.

58. Wilson's child was born approximately 3.5 weeks prematurely in an urgent fashion. His newborn child was placed in intensive care for one week. Despite the threats of Bahnson, Wilson took one week of paternity leave to care for his newborn child, wife, and three year old child.

59. A third male resident requested paternity leave one week before Wilson and Smock did. This third resident's wife had a high risk pregnancy. Bahnson sent the resident a "please see me email." He threatened the resident that he will not sign off on his graduation certificate if paternity leave was taken, as by Bahnson's definition a resident who takes paternity leave is not a competent surgeon. On information and belief, due to Bahnson's known history of threats and intimidation regarding paternity leave, the resident recorded the meeting with Bahnson using an

audio device.

60. Witnesses interviewed by Ohio State stated Bahnson threatened them about paternity leave including:

- "We eliminated paternity leave,"

- "We stopped doing that years ago,"

- Telling residents to use a floating week of vacation instead of paternity leave,

- "You may have to extend your residency,"

- "I strongly encourage you not to take paternity leave as it could affect your future."

- "I thought we had to give you 3 weeks of vacation, but we are only required to give you 2 weeks. Isn't that interesting?"

61. On information and belief, Bahnson told two female urology residents to take birth control so they do not become pregnant. One of these female residents was told by Bahnson to "come to my office and take birth control, or be fired."

62. On information and belief, Ohio State and Bahnson have intimidated these female residents into not reporting the incident stated above.

63. On information and belief, a male resident was told by Bahnson to be "celibate for urology" and Bahnson inappropriately questioned the male resident on his sexual activity.

**ii.** **Threats and action in response to ACGME survey in 2011.**

64.  The ACGME is an independent organization responsible for accrediting medical residency programs.

65. As part of the continuing requirements for accreditation, the ACGME anonymously surveys residents on a variety of subjects pertaining to their residency program.  These subjects

11

include:

- Fear and intimidation;

- Does the program respond to survey deficiencies in order to improve and not to punish?

- Whether maximum working hours (80 hours) per week are being adhered to;

- Whether requirement to have one day off of work per week is being followed;

- Continuous hours scheduled;

- Duty hours generally;

- Patient needs;

- Sufficient supervision;

- Faculty and staff interested in residency education;

- Appropriate level of supervision Faculty and staff create environment of inquiry;

- Satisfaction that evaluations of faculty are confidential;

- Satisfaction with feedback after assignments;

- Opportunity to evaluate program;

- Satisfaction with process to deal with problems and concerns;

- Whether residents can raise concerns without fear;

- Overall evaluation of the program.

66. In early 2011, ACGME survey results were reported in which Ohio State's urology program performed poorly in the responses by the residents, particularly in the  categories of fear and intimidation, ability to bring up concerns of program deficiencies without retaliation, the program's interest in teaching residents, and if the residents would choose the program again if given the option to.

67. In response, Bahnson stated he will extirpate the "bad residents" and that the residents are "despicable people." Bahnson retaliated against the residents, including Wilson, by directing negative performance reviews.

68. Shortly thereafter in early 2011, Bahnson threatened Wilson stating he signs Wilson's certificate to graduate, Wilson's credentialing, and he determines whether or not Wilson can take the boards.

69. In Spring 2011, the ACGME visited Ohio State's urology department to investigate the poor survey results and evaluate accreditation. After the ACGME visit, Bahnson was removed as Program Director. On information and belief, Bahnson was removed as Program Director because of the actions taken by the ACGME. Ohio State enabled Bahnson to appoint Box as his successor as Program Director.

70. Ultimately, the ACGME renewed Ohio State's accreditation for three years, instead of the maximum renewal of five years. The shortened renewal greatly angered Bahnson, and Bahnson stated his anger publically on several occasions. During an educational meeting with the faculty and residents, Bahnson told the residents "shame on you" for "ruining the program."

71. In retaliation for the poor ACGME survey results, Bahnson placed Wilson on "focused review" later in 2011. Wilson was not even working with Bahnson at this time; Bahnson was located at Ohio State's main hospital while Wilson worked eight months at satellite hospitals.

72. Wilson reviews at the satellite hospitals from the attending physicians he actually worked with were overwhelmingly positive during this eight month period.

73. In a meeting with Wilson in December 2011, Bahnson stated the reason Wilson was placed on focused review is that Wilson angered him. Furthermore, Bahnson demanded to know who answered the ACGME survey poorly. Fearing Bahnson's retaliation, Wilson recorded this

meeting with an audio device.

74. After placing Wilson on "focused review," Bahnson disparaged Wilson with false statements in emails to hospital administrators at Ohio State, including Thomas. In direct contradiction to the malicious reasons he stated to Wilson and Wilson's performance reviews from other physicians, Bahnson told hospital administrators that Wilson was placed on focused review for "poor performance in ICS and Professionalism Core Competencies." Bryan Martin, Ohio State's associate dean of graduate medical education, questioned Bahnson and asked whether he wanted Wilson to come before the professionalism Council. The professionalism Council would have given Wilson an opportunity to be heard and expose Bahnson false statements. In order to not be exposed, Bahnson responded by email to Dr. Martin "No. He has zero emotional intelligence and his ego would be fractured beyond repair by such a meeting."

### iii. Blatant attempt by Bahnson to undermine Wilson's career in 2012.

75. On or about March 28, 2012, Wilson treated a patient as directed with a high standard of professional care. At or about 4:00 pm on March 28, 2012, the patient had a foley catheter removed. At or about 4:50 pm on March 28, 2012, the patient received a CT scan. The hospital notes on the patient reflect the care given to the patient. Wilson completed his work day with the patient fully treated as instructed and left the hospital at approximately 5:00 pm. Wilson was not "on call" on March 28, 2012, meaning he had no further obligations at the hospital that day.

76. Wilson went to dinner at approximately 5:15 pm on March 28, 2012 and did not carry his hospital provided pager with him. Wilson was not required to carry a pager because he was not on call.

77. At approximately 6:45 pm on March 28, 2012, Wilson returned to his vehicle and noticed he received a page at approximately 5:20 pm. Wilson then checked his Ohio State email account

14

for the first time since approximately 4:00 pm and noticed an email from Bahnson from approximately 4:49 pm. Bahnson's email stated, "Be sure to check on him [Patient's Name] to get his catheter out and that he got his post implant CT scan.

78. Wilson immediately replied to Bahnson upon reading the email stating:

> "Both done. I had them d/c his catheter at 4pm – 3.5 hours after the spinal per your instructions. He was encouraged to drink plenty of fluids and has already voided. CT is confirmed to be done. He is stable and should be D/C from ASU shortly."

79. The next day, Wilson received a reply email from Bahnson stating, "please see me." Thomas was included on the email chain.

80. Wilson met with Bahnson at approximately 5:00 pm on March 29, 2012. Bahnson demanded that Wilson recount the details of his care of the patient on March 28, 2012. Wilson explained his care in detail to Bahnson. Bahnson then derided Wilson for not immediately responding to his page at 5:20 pm on March 28th. Bahnson said he would discuss "what to do with [Wilson]" at a meeting the next day with Ohio State administrators, including Thomas. Bahnson discussed the "effects" of the ACGME survey taken by the residents the prior year. Bahnson also threatened Wilson stating he was trying to fire Wilson, insulting Wilson's patient care, and stating he is purposefully documenting instances to give him cause not to sign Wilson's training certificate at the end of residency to prevent Wilson from sitting for the boards.

81. On March 30, 2012, Bahnson sent the urology faculty and others an email claiming the patient treated by Wilson did not have the foley catheter removed or a CT scan performed. Bahnson also claimed Wilson never responded to Bahnson's communications regarding the patient. These statements were knowingly false and are easily disproven by Ohio State's patient records and Bahnson's emails with Wilson.

82. An Ohio State staff member included in Bahnson's March 30, 2012 became very

15

concerned about Bahnson's malicious behavior towards Wilson.  As a result, the staff member provided Wilson a copy of the March 30, 2012 and other emails by Bahnson defaming his professional character.

83. In April 2012, Wilson emailed Thomas and Brian Martin addressing the malicious behavior Bahnson had taken against him.  Wilson explained Bahnson's behavior was counterproductive to learning, malicious, and retaliatory.  Wilson followed this email with a meeting with Bryan Martin regarding Bahnson's behavior.  The email was ignored by Andrew Thomas and minimized by Bryan Martin.  No action was taken by Ohio State.

### iv. Discriminatory statements, Physical attacks and verbal attacks perpetrated by Bahnson to intimidate residents, including Wilson.

84. In 2013 Bahnson verbally attacked a resident and disparaged him to faculty at Ohio State. The resident was forced to leave the urology program at Ohio State for a urology program in Louisville, Kentucky. The resident reported Bahnson's behavior to Ohio State and the ACGME on multiple occasions, but no action was taken.  On information and belief, some of these meetings between the resident and Bahnson were recorded to document Bahnson's verbal abuse and intimidation.

85. In 2013, a graduated resident was prevented from moonlighting after Box refused to sign his hospital credentialing papers and made comments to the hospital causing the resident to have credentialing denied.  Box later claimed these actions were done by "accident."  On information and belief, Box prevented this resident from moonlighting at the direction of Bahnson in retaliation for ACGME survey results.

86. In 2013, another graduated resident was prevented from starting his job for a significant period of time because Bahnson and/or Box negatively reported his professionalism and hygiene. On information and belief, this action was taken in retaliation for ACGME survey results.

87. In 2013 or 2014, Bahnson struck a nurse in the face with a pair of surgical gloves.  The nurse reported this assault and other instances of verbal abuse by Bahnson to the nurse manager. The nurse manager strongly encouraged the nurse to drop the complaint, stating any complaint about Bahnson will go through Bahnson for review.  As a result, the nurse was instructed it was best for her not pursue a complaint.  The nurse's employment was terminated by Ohio State shortly thereafter. In 2013 or 2014, Bahnson kicked a nurse in the leg.  This incident was reported to Ohio State to a nurse manager, and the nurse manager said to not file an official complaint because Bahnson would be the one to review the complaint. This nurse's employment was also terminated by Ohio State.

88. In 2013, a medical oncologist at Ohio State was told his nurse practitioners were being sexually harassed by Bahnson.  The oncologist reported the incidents to Ohio State and no action was taken.  Subsequently, the medical oncologist told his nurse practitioners to avoid Dr. Bahnson.

89. Bahnson harassed, discriminated, and ostracized a female pathologist at Ohio State. Bahnson instructed all urology residents not to communicate with her.  Ohio State interviewed the pathologist for its Case Report, but intentionally withheld her testimony for the Case Report.

90. Bahnson has made malicious attempts to sabotage the career and research of an attending urologist at Ohio State.  Bahnson forced the attending to stand alone for an entire meeting to publicly embarrass the attending urologist in front of the urology department.  Ohio State interviewed the attending urologist for its Case Report, but intentionally withheld his testimony for the Case Report.

91. A secretary at Ohio State contacted Wilson after he communicated his allegations to Ohio State to inform him that Bahnson has harassed her.

17

92. While Wilson was employed at Ohio State, at least six residents left the program or had mental breakdowns due to Bahnson's malicious behavior:

- A resident switched from urology to anesthesia because the program was "a big problem;"

- A resident switched from urology to business;

- Another resident switched from urology to anesthesia;

- A resident transferred to Louisville, Kentucky;

- A resident was fired and Bahnson has taken actions to prevent the resident from being able to practice medicine in any capacity;

- Due to the harassing nature of Bahnson and the Ohio State urology program, a resident was committed to a mental institution for a period of time;

- Due to the harassing nature of Bahnson and the Ohio State urology program, another resident now requires continuous psychotherapy, which the resident did not require before residency.

93. Many witnesses interviewed by Ohio State testified without hesitation that Bahnson intimidates and threatens residents.

94. A resident stated that when he approached Bahnson to change the order of presentations in conference, Bahnson said to him "I'm assuming you are here to turn in your resignation; you know more about education than I do."

95. Another resident stated to Ohio State that Bahnson threatened to "cut off his balls."

96. Another resident stated that after a patient complained about his care, Bahnson said to him "If that ever happens again, I will call up your future jobs and tell them not to take you."

97. Another resident stated that he has heard Bahnson say in a group setting "Remember, I'm

the one who signs your recommendation letter at the end of residency."

98. Ohio State found the testimony of the residents credible on these issues.

99. Ohio State urology was denied an additional resident slot. Bahnson blamed the residents for this denial because of the ACGME survey results. Ohio State found the testimony of the residents credible that Bahnson threatened residents regarding the results of the ACGME survey.

100. Bahnson said that "If you have a breach of professionalism, without warning, you will be placed on focused review, leading to probation and dismissal."

101. Bahnson makes threats such as "Be more prepared for journal club or I'll send you back to (your home state/country)" or "Come to work well-groomed and showered or I'll send you back to (your home state/country)."

102. Bahnson physically assaulted a resident by grabbing his arm and swinging him around in anger. Bahnson then asked the resident "Who's your Daddy?" while physically restraining the resident.

103. Bahnson asked another male resident "Who's your Daddy?" and forced the resident to respond "Dr. Bahnson, you're my Urology daddy." Bahnson replied "That's right, I'm your Daddy."

104. Bahnson was in a patient room with patients and physicians of eastern Indian descent and said "There is a toxic level of Indians in this room." Bahnson admitted to Ohio State he jokes that he would like to change the name of the American Urological Association to the American Indian Urological Association because of the number of Indians in the field of urology.

105. When a German student was visiting the urology department, Bahnson saluted her with "Heil Hitler." Ohio State found witness testimony of this event credible.

106.     Wilson is a German-Jewish descendent. His paternal grandmother immigrated to the United States from Germany in response to World War II.

107.     In the presence of Wilson during his second year as a urology resident, Bahnson told an African American medical student on her first encounter with him that "lynchings were common of African Americans not too long ago and things have come a long way."  The medical student told Wilson that the statement made her very uncomfortable.

      **v.**    **Bahnson controlled Box.**

108.     Although Box held the title of Program Director, Box was merely a figurehead. Bahnson controlled Box's actions as Program Director.  Consequently, Box failed to fulfill the duties of Program Director and did not provide the intended buffer between Bahnson and the residents.

109.     A witness interviewed by Ohio State stated Box "does what Dr. Bahnson tells him to do over what the residents want."

110.     Another Witness stated "Box doesn't listen to his moral compass when he carries out Dr. Bahnson's orders."

111.     Box is "Bahnson's golden boy" and Bahnson has Box "wrapped around his finger."

112.     Box is "just the messenger" for Bahnson.

113.     Ohio State determined in its Case Report "[t]he impact of Dr. Box's lack of authority as Residency Program Director is that there has been no buffer between residents and Dr. Bahnson's intimidating behavior."

      **vi.**    **Malicious attacks by Bahnson, Box, and Thomas against Wilson and others in June and July 2014.**

114.    Wilson was a Chief Resident scheduled to graduate his residency in 2014.

Wilson's last scheduled day of work at Ohio State was June 30, 2014.

115.    Wilson was one of three Chief Residents.  The other Chief Residents were

Andrew Smock ("Smock") and David Ludlow ("Ludlow").

116.    On or about December 27, 2013, Wilson received a midyear review of his

performance as a Chief Resident from Box.  The review was very positive and stated in part:

> "I congratulated and thanked Dr. Wilson for the excellent job he [and the] other
> chiefs have done with resident conference, improving morale of the residency
> program, and the overall improvement in in-service scores compared to last year…"

> "…The faculty very much appreciate Dr. Wilson's work ethic and attention to detail.
> I encouraged him to continue his dedication to excellence and that with this he has
> made himself and the other residents better… Overall I am happy with Dr. Wilson's
> performance at this stage in his residency and he is meeting expectations for a PGY 5
> resident."

117.    On or about June 16, 2014, Wilson received a final review for his performance as

a resident from Box.  The review was very positive and stated in part:

> "[Wilson] was congratulated for his dedication to urology and becoming an excellent
> clinician… Dr. Wilson's systems based practice, medical knowledge, patient care and
> problem based learning and improvement are excellent.  His professionalism and
> interpersonal and communications skills are very good… Dr. Wilson has done very
> well in residency and is planning to join a private practice group in Pittsburgh, PA.
> With this final summative evaluation, I verify that Dr. Jeffrey Wilson has
> demonstrated sufficient competence to independently practice the specialty of
> urological surgery."

118.    Traditionally, Chief Residents in all medical specialties are excused from the last

few days of work to provide them with additional time to study for their respective board

examinations and potential relocations to positions as attending physicians after residency.

119.    However, on Friday afternoon June 27, 2014, Wilson, Ludlow and Smock

received emails from Bahnson and Box stating all three Chief Residents had to work on Monday,

June 30, 2014.

120.     In accordance with Bahnson's and Box's email, Wilson worked at Ohio State on June 30th from approximately 7:45 a.m. until approximately 6:00 p.m.

121.     Ludlow, for reasons known to him, took a personal day on June 30, 2014.  Ohio State policy allows employees to take a certain amount of personal/sick days per year without showing cause.  On information and belief, June 30, 2014 was the only personal/sick day taken by Ludlow during his fifth year of residency from July 1, 2013 to June 30, 2014.

122.     Wilson did not definitively know in advance that Ludlow was taking a personal day on June 30, 2014.  Wilson assumed his co-Chief Residents would conform to the instructions given by Bahnson and Box on June 27, 2014.

123.     On information and belief, Wilson and Smock were the only graduating Chief surgical residents working in any medical specialty at Ohio State on June 30, 2014.

124.     Wilson received a final evaluation from Box on June 30, 2014, which stated in part:

> "Dr. Jeffrey Wilson did successfully complete Urology residency training at The Ohio State University… Dr. Wilson was not subject to institutional disciplinary action… To the best of our knowledge, no conditions exist that would impair Dr. Wilson's ability to practice general medicine… I have recommended Dr. Wilson for the certifying exam administered by the American Board of Urology.  At the conclusion of Dr. Wilson's Urology training, he was judged capable of performing all the categories of procedures listed in the ACGME Urology Surgical Competencies independently and completely, without direct supervision… Based on a composite evaluation by The Ohio State University Department of Urology Clinical Competency Committee, Dr. Jeffrey Wilson is recommended highly to you this June 30, 2014 as being qualified to practice competently and independently in this specialty (Urology) without direct supervision."

125.     Bahnson called a meeting with Wilson and Smock at 1:00 p.m. on June 30, 2014. The meeting last approximately two minutes.

126.     Because of the history of abuse and intimidation perpetrated by Bahnson, both Wilson and Smock used their cell phones to make audio recordings of the meeting.

22

127.     At the meeting, Bahnson was angered that Ludlow did not come to work that day.

The following is a transcript of the meeting:

Bahnson:
I need to get some information from the two of you.  Did you have a discussion with
Dr. Ludlow this weekend either or both of you?  Vis-a-vie him showing up for work?

Smock:
No.

Bahnson:
You did not?

Wilson:
No.

Bahnson:
This would not be a good time to be anything other than completely truthful.  Do you
want to revise your answers because somebody is lying.  I am going to find out who
and if it is either of you two, you are in deep shit. I mean really deep shit. We are
talking about your careers' here. Alright, let's try this question.  Did you both get an
email from Dr. Box this weekend telling you were not done until the end of today and
that you were expected to be at work?

Smock:
yes.

Bahnson:
And you had no contact with Dr. Ludlow after that?

Wilson:
I had contact with him, but--

Bahnson:
What did you talk about?

Smock:
We had the end of the year chief OR staff thing on Saturday night.

Bahnson:
OK

Smock:
We talked about OR stuff. We talked about staff. Introduced our families to each
other and I did not see him after that.

23

Bahnson:
No discussion about whether or not he was going to be at work today?

Smock:
I do not know what his plans were.

Bahnson:
You don't?

Smock:
No.

Bahnson:
Same with you?

Wilson:
Same.

Bahnson:
I hope you are telling the truth.  That is all I need from you now.

128.    This meeting was the last time Bahnson communicated directly with Wilson.

129.    Wilson and Smock were the last urology residents to leave clinic on June 30, 2014.

130.    The next day, Wilson began studying for the boards fulltime.

131.    Wilson's boards examination was scheduled for July 15, 2014.  The urology boards are given only once per year.  Examinees could choose to take the exam on either Monday, July 14, 2014 or Tuesday, July 15, 2014.

132.    The exam is part one of two for the urology board certification by the American Board of Urology. The materials required to sit for the exam included a notarized application, supporting documents, a $1,300 fee paid by the candidate, and a Program Director's letter confirming residency status.  The application materials were due on November 1, 2013.

133.    Wilson submitted all of the required application material for the exam before

November 1, 2013. The American Board of Urology confirmed all the required material to take the exam were present before November 1, 2013.

134.     On or about April 1, 2014, Wilson received a letter from the American Board of Urology stating, "I am pleased to advise you that you are admissible to the 2014 Qualifying (Part 1) Examination of the American Board of Urology to be administered at Pearson VUE test centers throughout the United States." The letter further instructed Wilson to schedule his test after May 1, 2014.

135.     On or about May 7, 2014, Wilson scheduled his board examination for July 15, 2014 at a Pearson VUE test center in Columbus, Ohio. The test center was approximately a two minute drive from Wilson's former home address in Westerville, Ohio.

136.     Wilson accepted employment as an attending urologist in Pittsburgh, Pennsylvania. In preparation for his and his family's move to Pittsburgh, Wilson sold his house in Westerville, Ohio, which closed on or about June 9, 2014.

137.     To adequately prepare for the urology boards, Wilson delayed the start of his new job in Pittsburgh and rented his former house from on or about June 9, 2014 from the buyer until July 21, 2014 for the amount of or about $3,800.00.

138.     Wilson scheduled the closing of his new home in Pittsburgh, Pennsylvania for the day after the exam on July 16, 2014. In order to purchase the house, Wilson was approved for a physician's mortgage. The mortgage specifically required Wilson to certify he took the urology boards on July 15, 2014.

139.     Wilson's Employment Agreement had a provision that it may be immediately terminated by his employer for breach of medical ethics.

140.     Bahnson, Box, and Ohio State were aware of Wilson's future employment

25

position in Pittsburgh and his future move to a new dwelling, along with his requirement to take the urology boards and maintain ethical medical standards.

141.     As physicians and as the employer of physicians, the Defendants knew or should have known the requirements involved in obtaining a physician's mortgage.

142.     Wilson began studying for the urology boards in June 2014. On July 1, 2014, Wilson began studying fulltime for the urology boards.  Wilson diligently studied fulltime for the boards until Friday, July 11, 2014 at approximately 10:50 a.m. when he received an unexpected email from the Pearson VUE testing center stating his exam on Tuesday, July 15, 2014 had been canceled. This cancellation was less than two business days before the exam.

143.     The message from Pearson VUE greatly disturbed Wilson and he began to immediately investigate the situation.

144.     At approximately 10:58 a.m. on July 11, 2014, Wilson received a message from the American Board of Urology ("ABU") which instructed him to call the ABU urgently.

145.     Soon after, Wilson called the ABU.  The ABU secretary informed Wilson that the cancellation was not a mistake.  Puzzled and distraught, Wilson asked what was going on.  The secretary did not explain the situation, but rather stated that the ABU Executive Secretary Dr. Gerald Jordan would contact Wilson regarding the matter after a meeting concluded at noon.

146.     When Wilson was not contacted by Dr. Jordan shortly after noon, Wilson called the ABU again at approximately 1:00 p.m.  The ABU told Wilson that Dr. Jordan was still unavailable.

147.     At approximately, 1:55 p.m., Dr. Jordan contacted Wilson by telephone.  Dr. Jordan told Wilson that he could no longer sit for the urology boards because the Ohio State Department of Urology unilaterally rescinded his program letter mid-morning today (Friday, July

26

11, 2014).  Dr. Jordan said there was nothing the ABU could do in this situation because policy required a complete file in order to take the examination.

148.    Bahnson was aware of this ABU policy because he served as Vice-President of the ABU for 2013.

149.    Wilson's ABU file was complete from November 1, 2013 until July 11, 2014. Now, suddenly, less than two business days before his scheduled exam, Wilson's ABU file was made incomplete by the unilateral actions of the Ohio State Department of Urology without any warning or opportunity to be heard.

150.    Stunned and upset, Wilson contacted his co-Chief Residents Smock and Ludlow. At this time, Smock and Ludlow informed Wilson that the same situation has befallen them; both Smock and Ludlow had their program letter rescinded by Ohio State that morning on Friday, July 11, 2014.  Smock and Ludlow were told by Ohio State that their program letters were rescinded because Ludlow took a personal day on June 30, 2014.

151.    Smock was scheduled to take the urology boards in Columbus, Ohio on July 14, 2014.

152.    Ludlow was scheduled to take the urology boards in Las Vegas, Nevada on July 14, 2014.

153.    In response, at approximately 3:02 p.m. on July 11, 2014, Wilson attempted to contact Box by telephone for an explanation of these events.  Box did not accept the telephone call, so Wilson left Box a voicemail asking Box to call him about the situation.

154.    Next, Wilson called Bahnson's office at Ohio State seeking an explanation. Bahnson did not accept Wilson's telephone call so Wilson left a message with Bahnson's wife asking to be called back by Bahnson about this situation.

155.        Neither Box nor Bahnson ever responded to Wilson.

156.        The Ohio State Department of Urology did not respond to Wilson.

157.        Ohio State, Bahnson, and Box intentionally waited to wrongfully rescind Wilson's program letter until the Friday before the exam to inflict greater damage against Wilson.

158.        Given the sudden and immediate damage caused by the wrongful rescission of the program letter, the lack of any warning or ability to be heard, and the lack of any response to Wilson's multiple attempts to contact Bahnson, Box, and the Ohio State Department of Urology regarding the situation, Wilson engaged legal counsel on Friday, July 11, 2014.  Wilson's counsel sent Bahnson a cease and desist letter. Box, the ACGME, the ABU, and Bryan Martin were also carbon copied. The letter outlined Wilson's damages for the wrongful rescission and demanded resubmission of Wilson's program letter. The letter was not responded to on July 11, 2014.

159.        Desperate for a response of any kind, Wilson called Box again on the morning of Saturday, July 12, 2014. Box did not accept the phone call.  In fact, Box turned off the voicemail feature of his telephone, thus, preventing Wilson from leaving a voicemail.

160.        Still seeking a response, Wilson emailed Box at approximately 10:53 a.m. Saturday, July 12, 2014.  In the email, Wilson states in part:

> "I am emailing you in a last ditch effort for reasonable minds to prevail. I tried to call you on your cell phone, but you did not answer, and your voicemail was full.  I am asking that you resubmit my program letter to the board of urology, which you have withdrawn without justification, so that I can sit for the boards on Tuesday."

> "I would like to make you aware that not sitting for the boards this Tuesday will cause substantial damages to me immediately.  I had to verify I am taking the boards before closing on my home, as I have a physician's loan on my home.  I am set to take the boards on July 15, and am closing on my home on July 16.  This severely

jeopardizes my loan.  We have sold our home in Columbus, and if we can't obtain a mortgage in Pittsburgh, my three year old and 3 month old children are without a home.  We also have $20,000 in escrow for the mortgage that we forfeit if we do not close on July 16th."

"Moreover, my contract with my employer specifically states that I have to be board eligible in order to work.  Even more, I have had to verify with them that I am taking part one in July 2014, and have had to do the same with multiple medical insurance companies as part of my accreditation  process.  I may not be able to work in a full capacity or at all if I do not sit on July 15th.  Moreover, I will suffer undue embarrassment and loss of reputation for having to disclose to my small group of partners and hospital that I could not sit for the boards because my chairman and program director have launched baseless personal attacks against me.  This loss of reputation will cause significant damages to me."

"All of this is over a situation where I did no wrong.  Moreover, I was given no warning this was about to happen from you or anyone else, and no due process.  I was never given a chance to defend myself.  The American Board of Urology stated the only reason I am not taking this test is due to the actions of Ohio State Department of Urology unilaterally, specifically mentioning my chairman and program director.  My first notification of this was on Friday, July 11 at 11am, not from you, Ohio State or the ABU, but from the PearsonVue testing center to tell me my test had been cancelled. Please Dr. Box, I ask you to reconsider your decision and resubmit my board letter immediately.  You as program director have the ability to fix this wrong.  Your actions were particular surprising considering I have copies of your reviews of my performance from this year, which are nothing less than stellar… Please give a call at your earliest convenience on my personal cell phone at..."

161.     Box never responded to Wilson's email on Saturday, July 12, 2014.

162.     Wilson did not receive any communications from Bahnson, Box, or Ohio State prior to the exam.  However, Ohio State's legal counsel contacted Wilson's attorney on Monday, July 14, 2012 at approximately 2:40 p.m., less than 18 hours before the exam on July 15, 2014 at 8:00 a.m.

163.     Ohio State's counsel and Wilson's counsel discussed the situation.  Wilson's counsel reiterated the demand that Ohio State resubmit Wilson' program letter to allow Wilson to take the exam.

164.     Ohio State's counsel said Wilson's program letter would be resubmitted if Wilson

signed a "document" provided by Ohio State.

165.     Ohio State's counsel transmitted the "document" at or about 3:08 p.m. on July 14, 2014.  A true and accurate copy of the "document" is attached hereto and incorporated herein as Exhibit B.  The "document" was a letter on Ohio State's letterhead and stated:

> Dear Dr. Bahnson and Dr. Box,
>
> I, Jeffrey Wilson, agree to provide a letter of apology for a serious breach of professionalism and for compromising the integrity of the urology program at The Ohio State University.
>
> I agree to register and successfully complete an approved course on medical professionalism.
>
> I understand the seriousness of my behavior leading to breaches of professionalism.
>
> This agreement was not made under duress and is of my own free will.
>
> _____
> Jeffrey Wilson, MD

166.     Wilson refused to sign the "document."

167.     The "document" was entirely false.  Wilson did not do anything unprofessional. Wilson did not do anything at all.  Wilson worked on June 30, 2014 and did not definitively know Ludlow would take a personal day, which he was entitled to take anyways.

168.     The "document" was specifically crafted by Ohio State in an attempt to limit its liability while Wilson was under duress.  Ohio State used the ability to take the urology boards as an attempt to extort Wilson into abandoning his legal claims.

169.     After Wilson refused to sign the "document", Ohio State's counsel informed Wilson's counsel that the program letter would be resubmitted to the ABU, allowing Wilson to take the urology boards.

170.     On information and belief, Ohio State already had submitted Wilson's program

letter before it transmitted the "document" to Wilson's counsel. The sole purpose of the "document" was to extort Wilson under duress.

171.     At or about 3:25 p.m. on July 14, 2014, Wilson contacted Pearson Vue to reschedule his urology boards examination. Wilson was told he was just released minutes before to sign up for the exam for the next day. However, PearsonVue told Wilson all testing centers in Ohio were now unavailable, as someone else had taken his place in Columbus. Pearson Vue administers tests of all types, not just for urology boards. All other testing centers in Ohio were similarly unavailable.

172.     At or about 3:45 p.m. on July 14, 2014, Wilson was forced to sign up for the exam in Pittsburgh, Pennsylvania.

173.     The testing center in Pittsburgh was located approximately 3 hours and 20 minutes by automobile from Wilson's former home in Westerville, Ohio. Conversely, the testing center where Wilson was originally scheduled to take the exam was only 0.8 miles and an approximately two minute drive from Wilson's former home in Westerville.

174.     In an effort to recoup some of his lost study time, Wilson's wife drove him to Pittsburgh so he could study during the drive. Unable to make alternative arrangements in such a short period of time, Wilson was forced to bring his three month old child with him to Pittsburgh.

175.     Wilson needed to leave immediately for Pittsburgh after scheduling the exam. Wilson had to pay for two hotel rooms for his stay in Pittsburgh in an attempt to get a good night's sleep, since his wife and their newborn son slept in a separate room. Wilson would have just stayed in his home, if he was able to take the test in Columbus as originally scheduled.

176.     Wilson was not able to properly study for the exam from July 11, 2014 through

July 14, 2014 because of the emotional distress inflicted on him from the wrongful cancellation of the exam. Wilson did not even know he would be able to take the exam until 3:45 p.m. the day before the 8:00 a.m. exam.

177.    Wilson arrived in Pittsburgh in the evening on July 14, 2014. Wilson was able to take the exam on July 15, 2014.

178.    Wilson incurred additional expenses by traveling to Pittsburgh that he would not have otherwise incurred. These expenses include, but are not limited to, approximately $866.08 for lodging, $60.00 for gasoline, and $70.00 for meals.

179.    The wrongful withdrawal of Wilson's program letter had profound negative effects on Wilson and Wilson's family. Wilson lost four pounds from July 11 – 15, 2014 because he was not properly eating due to emotional distress. Wilson became depressed, angered and stressed. Wilson's wife and mother lost hours of sleep and were emotionally distraught. Wilson feared he would lose his mortgage, his home, and his career. Wilson lost several days to pack his home in Westerville because of the wrongful withdrawal, causing an immense amount of stress to move out of his home in time with two young children. Wilson's lease on his former home expired on or about July 21, 2014. He already hired movers and had no ability to return to his former home. If Wilson did not take the urology boards on July 15, 2014, he could not have closed on his new home and his young family would have been homeless, along with his job status in jeopardy.

180.    Through conversations with Smock and Ludlow, Wilson learned that they were also able to take the urology boards because of Wilson's quick actions against Ohio State.

181.    However, Smock and Ludlow had similar problems to Wilson. Smock had to take the exam in West Virginia on July 15, 2014 when he was originally schedule to take the

exam in Columbus, Ohio on July 14, 2014.  Ludlow had to take the exam in San Diego,

California when he was originally schedule to take the exam in Las Vegas, Nevada.

185. 182.    The wrongful withdrawal of the program letter had a negative impact on Wilson's

performance on the exam.  Wilson excelled on practice examinations taken in prior years during

his residency.  However, Wilson was unsure whether he passed the exam due to his extreme

emotional distress.  Wilson remained emotionally distressed for several weeks until the exam

results were released.  Ultimately, Wilson passed the exam.

**vii.    Defamatory statements by Bahnson, Box and Thomas.**

183.    According to Ohio State's Case Report, Bahnson drafted a letter to the ABU to

make Wilson, Smock and Ludlow inadmissible for certification by the ABU on or about July 1,

2014. Bahnson showed the letter to Box and wanted him to sign it. Box declined to sign the letter

and suggested that they wait a week before sending it.

184.    On information and belief, Box suggested Bahnson wait to send the letter to

inflict greater damage against Wilson, Smock, and Ludlow and deprive them of due process and

an opportunity to be heard.

185.    Bahnson admits he conversed with Dr. Jordan of the ABU before sending the

letter rescinding the program letters of Wilson, Smock, and Ludlow.

186.    Bahnson admits "Dr. Jordan told him that he (Dr. Jordan) thought it unlikely that

the ABU would certify them if Dr. Bahnson didn't recommend them."

187.    Bahnson knew the immediate, irreparable harm he would inflict to Wilson,

Smock, and Ludlow by rescinding the program letters.

188.    According to the Case Report, Bahnson sent his letter to the ABU by U.S. Mail on

July 8, 2014.  Box declined to sign the letter with Bahnson, but stated he would send his own

letter. Bahnson's letter stated:

> "Due to an egregious breach of professionalism and responses which followed, it is my opinion the following three former Ohio State University residents should be inadmissible for certification by the American Board of Urology. The individuals are David V. Ludlow. Andrew Z. Smock and Jeffrey R. Wilson."

189.     On information and belief, Bahnson did not state the "egregious breach of professionalism" allegedly committed by Wilson, Smock and Ludlow.

190.     There was no "egregious breach of professionalism" committed by Wilson. Bahnson maliciously submitted this false statement to ABU to prevent Wilson from taking the urology boards.

191.     There was no "egregious breach of professionalism" committed by Smock and Ludlow.  Bahnson maliciously submitted this false statement to ABU to prevent Smock and Ludlow from taking the urology boards.

192.     Bahnson used his position as former Vice President of the ABU in an attempt to wrongfully prevent Wilson, Smock and Ludlow from taking the urology boards.

193.     Bahnson's statements to the ABU disparage Wilson's professional reputation.

194.     On or about July 8, 2014, Box sent his own letter to the ABU.  Box's letter stated:

> "I write to inform you of a change in my recommendation to the American Board of Urology regarding the three graduates [of] The Ohio State University in June 2014, David V. Ludlow, Andrew Z. Smock and Jeffrey R. Wilson. Very recently they were all involved in an egregious breach in professionalism. It saddens me to write this letter, but this type of behavior is not tolerated at Ohio State and as such I would like to retract the prior recommendation made to the board regarding these candidates. Understanding that the ABU's duty is uphold the public's interest, I feel obligated to inform you of this issue."

195.     On information and belief, Box did not state the "egregious breach in professionalism" allegedly committed by Wilson, Smock and Ludlow.

196.     There was no "egregious breach in professionalism" committed by Wilson.  Box

34

maliciously submitted this false statement to ABU to prevent Wilson from taking the urology boards.

197.    There was no "egregious breach of professionalism" committed by Smock and Ludlow.  Box maliciously submitted this false statement to ABU to prevent Smock and Ludlow from taking the urology boards.

198.    Box knew the ABU would cancel Wilson's urology boards as a consequence of Box's letter.

199.    Box knew the immediate, irreparable harm he would inflict to Wilson, Smock, and Ludlow by rescinding the program letters.

200.    Box recklessly stated Wilson "lied" about having knowledge about Ludlow's personal day before June 30, 2014.

201.    Wilson did not lie.  Wilson did not have definitive knowledge about Ludlow's personal day before June 30, 2014.

202.    Box admits that if Dr. Bahnson hadn't sent a letter to the ABU, he wouldn't have either. Box stated that "he would/should have done differently is to address the issue with the residents directly, instead of going to ABU." Box admits his decision to send a letter to the ABU grew out of discussions with Dr. Bahnson. Box admits that he recommended to Bahnson that they sit on the letters for a week.

203.    Box sent the letter at the whim of Bahnson.  Box failed to adequately investigate the truthfulness Bahnson's allegation before reiterating them to the ABU and others.

204.    Box had opportunities to discuss Bahnson's allegation with Wilson, but chose not to do so.

205.    Box's statements to the ABU disparage Wilson's professional reputation.

206.     Thomas admits Bahnson came to him on June 30, 2013 and was "hot" about the Chief Resident situation that had occurred that day. Thomas admits he recommended to Bahnson ways to address the alleged "unprofessional behavior" of Wilson, Smock and Ludlow, including clicking a box for "unprofessional behavior" on future license applications for these former residents or indicating unprofessional behavior, with comments, on future credentialing applications.

207.     Thomas recommended Bahnson publicly disseminate that Wilson was "unprofessional" without any investigation into the validity of the allegations.  Thomas never contacted Wilson to investigate the veracity of Bahnson's false allegations.

208.     By recommending Bahnson publicly call Wilson "unprofessional," Thomas has adopted this false statement as his own.

209.     Thomas knew the immediate, irreparable harm he would inflict to Wilson, Smock, and Ludlow by recommending to Bahnson that he publicly call Wilson "unprofessional."

210.      Thomas knew that by clicking a box for "unprofessional behavior" on future license applications for these former residents or indicating unprofessional behavior, with comments, on future credentialing applications, that Ludlow, Smock, and Wilson would be denied the ability to work at hospitals and become members of professional committees.  It is well known in the field of medicine that hospitals do not grant privileges to physicians who have the box for unprofessional behavior clicked.  Thomas is well aware of this due to his position as Chief Medical Officer at Ohio State.

211.     Thomas' statements to the ABU disparage Wilson's professional reputation.

212.     As Chief Medical Officer and Bahnson's immediate superior, Thomas condoned Bahnson's malicious behavior.

36

**viii.**    **Facts learned from Ohio State's Case Report and others after the events in June and July 2014.**

213.    The ACGME visited Ohio State Department of Urology in late May 2014 to address prior concerns of misconduct by the department.  At the meeting, the ACGME told the residents they knew Bahnson was creating a culture of fear and intimidation, and that he was the primary reason for the negative survey results.

214.    Several residents expressed fear of retribution from Bahnson and Box because the ACGME was conducting a site visit.

215.    Bahnson was informed by the ACGME in late June 2014 that yet another survey had negative results regarding  fear and intimidation, ability to bring up concerns of program deficiencies without retaliation, the program's interest in teaching residents, and if the residents would choose the program again if given the option to.  Bahnson was given an official, written warning from the ACGME regarding his intimidating and retaliatory behavior.

216.    An attending physician in the Ohio State Urology Department informed Wilson that Bahnson held a meeting in or about early July 2014 with Ohio State's urology faculty in response to the negative results from the latest ACGME survey.  At this meeting, Bahnson stated he has instituted his "reign of terror." At this meeting, Bahnson informed the faculty he was going to rescind Ludlow, Smock, and Wilson's letter to take the boards.

217.    Bahnson sent an email on June 20, 2014 to second year urology residents stating:

> "Your predecessors have irritated me. Best you know of it. Not a good idea to follow their lead. Please see me if this won't fit your PGY-2 agenda. If you still want to be a part of the team send Katie  and Dr. Box a note indicating you have read this and will conform."

218.    The June 20, 2014 email related to the unfavorable results of the ACGME survey.

219.    Bahnson blamed the residents, particularly the Chief Residents, for the Urology

Department's failure to be approved by the ACGME for an additional resident slot per year.

220.     Bahnson ambiguous "egregious breach of professionalism" was a farce.  Bahnson fabricated the "egregious breach of professionalism" as a means to retaliate against Wilson, Smock and Ludlow for the results of ACGME survey.

221.     Bahnson retaliated against Wilson, Smock and Ludlow to "set an example" for the junior urology residents.  Bahnson desired to create an atmosphere of fear and intimidation to coerce junior residents to falsely give positive responses to the ACGME survey.

222.     Residents have stated in response to Bahnson actions against Wilson, Smock and Ludlow:

- "Now that the three residents had action taken against them, the fear has increased."

- "The action taken against the three residents was retaliation and the punishment did not fit the crime."

- "I would have expected due process in this case."

- "Dr. Bahnson is powerful. He can do things to people without due process. This recent event is a total abuse of power."

- "Those three residents did not deserve that treatment. They were good people."

- "What happened to the chiefs made me lose hope."

223.     An attending physician in the Ohio State Urology Department informed Wilson that Ohio State held a meeting on July 11, 2014 in response to the letter from Wilson's counsel. At this meeting, Bahnson repeatedly disparaged Wilson's professional character to faculty in the urology department.  Bahnson falsely called Wilson "unprofessional," "unethical," and insinuated that Wilson was a liar.  Box was complicit with Bahnson's statements.

224.     On information and belief, on July 14, 2014, an unknown administrator overruled Bahnson and had the program letters of Wilson, Smock and Ludlow reinstated.

225.     In July 2014, Box told residents during reviews that Bahnson and the urology department were going to "break them down" and "destroy their morale" and there's nothing they could do about it. When asked why, he said, "you have to know that what you put on the ACGME survey can only hurt you."

226.     On or about August 2014, a urology resident informed Wilson that Bahnson lashed out in anger against the residents in response to the ongoing investigation by Ohio State. The resident told Wilson that Bahnson took his lunch tray with food and threw it at a resident.

227.     In or about September 2014, Box told an attending physician from another specialty that Wilson, Smock and Ludlow would not sit for the oral urological boards in 2016 because the Ohio State Urology Department is going to try to prevent their eligibility. He also said the three, previous years' chief residents' boards would be interfered with in January 2015 for participating in the investigation. Box specifically stated "that bridge is burned" in regard to Wilson, Smock and Ludlow's oral boards.

228.     Upon hearing this threat of future retaliation, the physician reported Box's statements to Dr. Edmund Funai, Chief Operating Officer of Ohio State's medical center at the time. The physician also informed Wilson by telephone.

**ix.     Ohio State creates a biased, self-serving Case Report in an effort to shield itself from liability.**

229.     On July 21, 2014, Wilson's counsel sent a demand letter for compromise purposes to Bahnson and Box while carbon copying Ohio State's counsel. The letter stated a deadline of July 28, 2014.

230.     In response to the July 21st letter, Ohio State's counsel informed Wilson's counsel

that Ohio State would open an investigation regarding the rescission of the program letters.

231.     On information and belief, Ohio State would not have opened an investigation without receiving the July 21st letter.

232.     On or about July 26, 2014, Wilson filed formal complaints against Bahnson and Box with the ACGME, the ABU, the State Medical Board of Ohio, and Ohio State's Human Resources Department.  A true and accurate copy of Wilson's complaint is attached hereto and incorporated herein as Exhibit C.

233.     Wilson provided Ohio State's President Dr. Michael Drake, Dr. Funai, and Thomas a courtesy copy of the complaint to facilitate Ohio State's "investigation."

234.     News of an investigation against Bahnson spread quickly to current and former residents and other employees of Ohio State.

235.     These current and former residents and other employees readily volunteered information about Bahnson's history of misconduct to Wilson.

236.     A former resident, who Bahnson had already retaliated against in ways that negatively impacted his career, contacted Wilson and Ohio State to testify against Bahnson.

237.     On or about July 29, 2014, the former resident emailed Dr. Funai, Thomas and others stating in part:

> "I am a recent graduate (2013) of the urology residency program at the Ohio State University Medical Center. Recent events that have been brought to my attention prompted this email, despite concerns of repercussions from leadership within the department. Please consider this email anonymous."

> "I would be happy to speak with you at your earliest convenience, but would greatly appreciate an assurance of confidentiality.  Despite concern for professional/career ramifications, after careful consideration I felt it was the appropriate course of action given my experiences and the experiences of other residents/graduates of this program."

238.     On or about July 29, 2014, Thomas responded to the former resident in a

dismissive manner stating:

"…thank you for your email.

"As you are most likely already aware, we are in the midst of interviewing all of the current PGY-3's, 4's and 5's in the program as well as the graduates from this past June."

"I appreciate your willingness to speak with us, but once all of the interviews noted above are completed, we will reassess whether we need to talk with any additional former graduates of the program."

"I hope you are well otherwise and that practice is going well."

239.    On July 28, 2014, Ohio State's counsel contacted Wilson's counsel to ask for more time to respond to the July 21st letter and permission for Ohio State's Human Resources Department to interview Wilson.

240.    On or about July 29, 2014, Wilson voluntarily allowed Ohio State's Human Resources Department to interview him about the misconduct perpetrated by Bahnson, Box, and Ohio State.

241.    On July 31, 2014, Wilson's counsel questioned the veracity of the "investigation" to Ohio State as the actions of Ohio State appeared dilatory.  In apparent response, Dr. Funai emailed Wilson stating:

"Dr. Wilson:"

"There are many people that have been interviewed, and the list has grown just in the past few days.  Rest assured, we are taking these allegations seriously and want to have a comprehensive assessment of the facts.  I believe Dr. Martin is out for the next several days, but Ms. Dillingham tells me they should have a summary of findings within about 10 days. This will then guide next steps."

"We are very motivated to speak, in confidence, with anyone associated with the program that has input to provide.  What matters most is gathering the facts, and I can assure you that we will act appropriately based on the evidence."

"Thank you for your patience."

41

242.    For the sake of compromise, Wilson decided to wait for the summary of findings.

243.    On or about August 6, 2014, an attending urology physician contacted Wilson to discuss the status of Ohio State's "investigation." The attending physician was very concerned about the scope and legitimacy of the investigation. He believed Ohio State was not taking the matter seriously because the urology faculty, including him, had not been interviewed by Ohio State. According to the attending physician, Ohio State had no plans to interview the urology faculty. The attending physician explained that Bahnson was maliciously trying to ruin his career. The attending physician wanted an opportunity to voice his grievances in confidence without fear of retaliation by Bahnson.

244.    In an effort to facilitate the urology faculty's desire to be heard in this "investigation," Wilson's counsel emailed Ohio State's counsel on August 8, 2014 stating:

> "It has come to my attention that Ohio State has not interviewed most of the attending urologists employed by Ohio State. In alphabetical order, Ohio State has failed to interview at least the following physicians…"

> "…This revelation is very disturbing. Dr. Funai emailed Dr. Wilson on July 31, 2014 stating '[Ohio State] should have a summary of findings within about 10 days.' You were copied on the said email. While it was Dr. Wilson's intention to allow Ohio State to conclude its summary of findings before acting further, he greatly questions the veracity of Ohio State's internal investigation and sees little reason to delay litigation any further in light of Ohio State's failure to interview its own faculty. The faculty have been subjected to the same environment of fear and intimidation. While many desire to share their insight, they fear retaliation from Dr. Bahnson and Ohio State should they individually volunteer such information. **All attending physicians in the urology department should be interviewed confidentially without delay.** If there is some legitimate reason why Ohio State has chosen not to interview these individuals, you should inform me immediately. Otherwise, it would appear that Ohio State's 'investigation' is nothing more than a farce and we shall act accordingly." (original emphasis).

245.    Following the August 8th email and a contentious conversation between counsels, Ohio State reluctantly interviewed the urology faculty for its "investigation."

246.    In August 2014, former nurses and staff from Ohio State's Department of

Urology contacted Wilson seeking a method to express their grievances against Bahnson.

247.     On or about August 12, 2014, Wilson sent Ohio State an email stating:

"I wanted to give you a heads up to expect emails from up to several Ohio State Department of Urology former clinic nurses and staff.  These individuals wish to shed light on Dr. Bahnson's HR violations, labor violations, racially and sexually discriminatory remarks, and intimidation towards them, among other concerns.  These behaviors have been occurring for some time."

"I hope Ohio State is willing to hear their stories."

248.     In September 2014, a former Ohio State nurse for the Department of Urology contacted Wilson stating she tried to get Ohio State to interview her, but Ohio State refused.

249.     On or about September 7, 2014, Wilson sent Ohio State an email stating:

"One more former Ohio State nurse has been trying unsuccessfully to be interviewed by you."

"Her name is [REDACTED], and she was fired while on FMLA by Ohio State Dept of Urology, and successfully reached a legal settlement over it.  She also witnessed some pretty egregious behavior by Dr. Bahnson."

"Would you be willing to contact her?  I have heard the investigation is wrapping up, and both her and I believe she has important information to provide."

250.     On or about September 15, 2014, Ohio State sent Wilson a copy of the Case Report.

251.     The Case Report is very selective in the matters presented in the Case Report and skews such matter in a light favorable to Ohio State in an effort to limit its liability to Wilson and other potential claimants.

252.     Ohio State used little to no testimony from the faculty beyond Bahnson and Box. Ohio State did not include any negative testimony from faculty.

253.     Ohio State did not include testimony from the faculty member who contacted Wilson about veracity of the "investigation."  This attending physician states Bahnson is

43

attempting to sabotage his career and research.

254.    Ohio State did not include testimony from a former nurse who states Bahnson slapped her with a surgical glove.

255.    Ohio State did not include testimony from another former nurse who states Bahnson kicked her in the leg.

256.    Ohio State did not include testimony from a pathologist who states she was sexually harassed, discriminated against and systematically ostracized by Bahnson.

257.    Ohio State did not include testimony from Wilson where he states Box revoked the Chief Resident's ability to make resident work schedules because the Chief Residents attempted to get residents the ability to attend an academic conference.  Bahnson and Box did not want residents to attend the academic conference.  Box said multiple times it had nothing to do with how the Chief Residents were making the schedule.  In an email to the Chief Residents Box states he is taking the schedule away from the Chief Residents for trying to get residents to the conference.  Ohio State is in possession of this email.

258.    Ohio State intentionally withheld the testimony about the conference so it could falsely portray Wilson, Smock and Ludlow in negative manner.  Ohio State only reported conflicting testimony from an anonymous witness falsely stating the Chief Residents were "lazy they passed work on to the junior residents, made the schedule and gave themselves the advantage, wouldn't help the junior residents on call and didn't always complete required paperwork."  On information and belief, the previous statement was made by Bahnson, Box, or Greg Lowe.

259.    Ohio State did not include testimony from another current and former staff who state they have been targeted and harassed by Bahnson. Some of these staff reported Bahnson's

actions to their superiors, who did nothing and threatened them by saying their complaints will go to Bahnson.

> ### ix. Ohio State enables Bahnson's behavior and condones his conduct.

260.     Wilson complained to Ohio State and the ACGME about Bahnson's malicious behavior several times over the term of his residency.

261.     Ohio State's records reflect a history of complaints from residents and staff about Bahnson's behavior.

262.     In spite of Bahnson's misconduct, Ohio State appointed Bahnson as the Chief of Staff-Elect of The Arthur G James Cancer Hospital and Richard J Solove Research Institute for a two year term beginning July 1, 2009. This was followed by a two year term as President, with an additional two year term as Past President.

263.     In spite of Bahnson's misconduct, Ohio State appointed reappointed Bahnson as professor and holder of The Dave Longaberger Endowed Chair in Urology in the College of Medicine effective July 1, 2014, through June 30, 2018

264.     Ohio State conclusively found that Bahnson engaged in threats, intimidation, discrimination and abuse.  Yet, Ohio State did not substantively discipline Bahnson for his actions. The only action Ohio State took against Bahnson was removing him as Chairman of the Urology Department and prohibiting him from working with residents.  He continues to work in the Ohio State Department of Urology, and, on information and belief, he is paid his full and substantial salary.

265.     Instead of substantively disciplining Bahnson, Ohio State wrote Bahnson a tribute on or about September 26, 2014 to hospital employees stating:

> "Bodo Knudsen, MD, FRCSC, will be serving as interim chair of the Department of
> Urology. Dr. Knudsen holds the Henry A. Wise II, MD Professorship and is associate

45

professor of Urology, director of Ohio State's Comprehensive Kidney Stone Program, vice chair of Clinical Affairs, interim program director for Urology and medical director of Health System Outpatient Urologic Services. He follows Robert Bahnson, MD, FACS, who will be continuing in a faculty role. Dr. Knudsen has agreed to continue in this role as we conduct a national search for a permanent chair."

"Dr. Knudsen earned his medical degree and was a urology resident at the University of Manitoba in Winnipeg, Canada. He was a board member of the Professional Association of Residents and Interns of Manitoba (PARIM) and rose to the role of president during his training. He also was a board member of the Canadian Association of Internes and Residents. Dr. Knudsen completed his fellowship training in endourology and stone disease at the University of Western Ontario in London, Ontario."

"He has authored eight book chapters, more than 40 journal articles and more than 100 scholarly presentations nationally and internationally. He serves as assistant editor of the Journal of Endourology and is a reviewer for an additional 10 journals in his field."

"He joined The Ohio State University Department of Urology faculty in 2005, and has shaped and grown the medical center's Comprehensive Kidney Stone Program. He leads an active research program, focusing on improving the surgical management of stone disease. This research has led to Dr. Knudsen being recognized a world expert in the use of lasers to treat kidney stones. In addition, he is one of a small group of surgeons nationally who performs HoLEP (holmium laser enucleation of the prostate), a surgical procedure to remove enlarged prostate tissue caused by benign prostatic hypertrophy."

"Dr. Knudsen is a member of the R.O.C.K. (Research on Calculus Kinetics) Society, a group of international investigators who focus on kidney stone research. He is also currently serving as the president of the Ohio Urological Society."

"Please join me in thanking Dr. Bahnson for his years of service and contributions to the department, and Dr. Knudsen for assuming the role of interim chair of the OSU Department of Urology."

266.    Ohio State shields Bahnson's actions from the public ire because Bahnson has

been successful in the past in attracting wealthy donors to the medical center.

267.    Bahnson is still permitted to use his influence to create a culture of fear and

intimidation at Ohio State.

268.    Box was removed as Residency Director for the Department of Urology.  Box

retains his position as an attending physician and he is still permitted to work with residents.

269.     Bahnson and Box still seek to inhibit Wilson's future credentialing and board certification in the field of urology without justification.

**COUNT I**
**DEFAMATION**
(Against All Defendants)

270.     Plaintiff incorporates paragraphs 1-11 and 21-269 as if fully restated herein.

271.     Wilson is not a public figure.

272.     Bahnson made false oral and written statements about Wilson. Plaintiff incorporates paragraphs 75-83, 114-170, 183-212, 219-224 and 251-269 as evidence of said allegation.

273.     Bahnson published such false statements to others. Plaintiff incorporates paragraphs 75-83, 114-170, 183-212, 219-224 and 251-269 as evidence of said allegation.

274.     Bahnson made such false statements with malice. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

275.     Bahnson made such false statements knowing the statements were false.

276.     Bahnson made such false statements with the intent to injure Wilson's reputation. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

277.     Bahnson made such false statements to expose Wilson to public hatred, contempt, ridicule, shame and/or disgrace. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

278.     Bahnson made such false statements to affect Wilson adversely in his trade or profession.

279.     Bahnson falsely stated that Wilson was unprofessional and unethical.

280.     An allegation that one has acted unprofessionally constitutes defamation per se.

281.     Box made false oral and written statements about Wilson.  Plaintiff incorporates paragraphs 75-83, 114-170, 183-212, 219-224 and 251-269 as evidence of said allegation.

282.     Box published such false statements to others. Plaintiff incorporates paragraphs 75-83, 114-170, 183-212, 219-224 and 251-269 as evidence of said allegation.

283.     Box made such false statements with malice. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

284.     Box made such false statements knowing the statements were false.

285.     Box made such false statements with the intent to injure Wilson's reputation. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

286.     Box made such false statements to expose Wilson to public hatred, contempt, ridicule, shame and/or disgrace. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

287.     Box made such false statements to affect Wilson adversely in his trade or profession.

288.     Box falsely stated that Wilson was unprofessional and unethical.

289.     Thomas adopted the false statements made by Bahnson about Wilson.

290.     Thomas instructed Bahnson to publish false statements about Wilson. Plaintiff incorporates paragraphs 75-83, 114-170, 183-212, 219-224 and 251-269 as evidence of said allegation.

291.     Thomas instructed Bahnson to publish false statements about Wilson being unprofessional.

292.     Thomas maliciously or recklessly instructed Bahnson to publish false statements

48

about Wilson.

293.     Thomas knew or should have known such statements were false.

294.     Thomas adopted such false statements with the intent to injure Wilson's reputation. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

295.     Thomas adopted such false statements to expose Wilson to public hatred, contempt, ridicule, shame and/or disgrace. Plaintiff incorporates paragraphs 75-83, 114-224 and 251-269 as evidence of said allegation.

296.     Thomas adopted such false statements to affect Wilson adversely in his trade or profession.

297.     Ohio State, by and through its employees, made and adopted the false statements of Thomas, Bahnson and Box.

298.     The "document" as referenced in paragraph 75-83, 114-224 and 251-269 communicated by Ohio State shows its adoption and approval of the false statements of Thomas, Bahnson and Box.

299.     The Urology professional community is small and closely knit.

300.     Wilson suffered damages to his professional reputation because of the false statements made by the Defendants.  These false statements directly attacked Wilson's professional conduct and reputation.  Many of these statements were communicated directly to the Urology professional community including, but not limited to, the ABU.

301.     Wilson was subjected to emotional distress, ridicule, shame and/or disgrace because of the false statements made by the Defendants.

302.     Wilson incurred damages in the form of additional expenses because of the false

statements made by the Defendants.  Wilson was unable to take his board examinations in Columbus, Ohio and was forced to emergently travel to Pittsburgh, Pennsylvania.  Wilson incurred additional expenses including, but not limited to $996.08 for travel and lodging.

303.     Wilson is entitled to recover damages, including punitive damages, for injuries caused by the defamatory statements made by the Defendants.

**COUNT II**
**TORTIOUS INTERFERENCE WITH CONTRACT**
(Against Bahnson, Box and Ohio State)

304.     Plaintiff incorporates paragraphs 1-11 and 21-269 as if fully restated herein.

305.     Wilson entered into a contract with Pearson VUE to take the urology boards in Columbus, Ohio after receipt of a completed application and payment of $1,300.00.

306.     Bahnson, Box and Ohio State had knowledge of Wilson's contract with Pearson VUE and the terms included therein.

307.     Bahnson, Box and Ohio State knew Wilson applied to take the urology boards.

308.     Bahnson, Box and Ohio State knew the requirements for Wilson to take the urology boards as Chairman of the Urology Department, Residency Director and a teaching hospital respectively.

309.     Bahnson, Box and Ohio State knew Wilson required a program letter to sit for the urology boards and complete his contract with Pearson VUE.

310.     Bahnson and Box rescinded Wilson's program letter without justification as retaliation against Wilson.  Ohio State condoned these actions as the employer of Bahnson and Box within the scope of their employment.  Plaintiff incorporates paragraphs 45-83, 97-101, 108-228, and 260-269 as evidence of said allegations.

311.     Pearson VUE could not perform under the terms of its contract with Wilson

50

because Bahnson and Box rescinded Wilson's program letter. By the time the program letter was resubmitted, Pearson VUE resold Wilson's place to take the urology boards in Columbus, Ohio.

312.     Consequently, Wilson was forced to take the urology boards at a Pearson VUE testing center in Pittsburgh, Pennsylvania instead of Columbus, Ohio.

313.     Wilson incurred damages in the form of additional expense because he had to emergently travel to Pittsburgh, Pennsylvania. Wilson incurred additional expenses including, but not limited to $996.08 for travel and lodging.

314.     Wilson is entitled to recover damages, including punitive damages, for injuries caused by the tortious interference of his contract with Pearson VUE by Bahnson, Box, and Ohio State.

## COUNT III
## <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
### (Against Bahnson and Box)

315.     Plaintiff incorporates paragraphs 1-11, 21-269, and 306-312 as if fully restated herein.

316.     Bahnson's and Box's extreme and outrageous conduct intentionally or recklessly caused serious emotional distress to Wilson. Plaintiff incorporates paragraphs 114-224 as evidence of said allegation.

317.     Bahnson and Box intended to cause emotional distress or knew or should have known that their conduct would result in serious emotional distress to Wilson. Plaintiff incorporates paragraphs 114-224 as evidence of said allegation.

318.     Bahnson and Box conduct was outrageous and extreme beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized

community. Plaintiff incorporates paragraphs 114-224 as evidence of said allegation.

319.    Bahnson's and Box's conduct was the proximate cause of Wilson's psychic injury.

320.    Wilson's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it. Plaintiff incorporates paragraphs 114-224 as evidence of said allegation.

321.    Wilson is entitled to recover damages, including punitive damages, for emotional distress and psychic injuries inflicted upon him by Bahnson and Box.

322.    The nature of Wilson's business relationship between Bahnson and Box entitles Wilson to protection by Bahnson and Box.  These defendants were Wilson's superiors at Ohio State who were entrusted with educating Wilson in the field of urology for a future career as an urologist.  Instead, Bahnson and Box unlawfully took actions against Wilson in an attempt to derail his career as an urologist.

323.    Wilson is entitled to recover for any injuries, including fright and terror, which result from a willful breach of duty, insult or unlawful treatment.

**COUNT IV**
**UNLAWFUL EMPLOYMENT PRACTICES**
**Title VII and 42 U.S.C.§ 2000e et seq.**
(Against Ohio State)

324.    Plaintiff incorporates paragraphs 1-11, 21-269, and 306-312 as if fully restated herein.

325.    The EEOC issued Wilson a notice informing him of his right to sue under Title VII, which was received October 25, 2014.

326.    Ohio State employs approximately 43,630 individuals.

327.    Ohio State is engaged in an industry affecting commerce.

328.     Bahnson served in a supervisory position and exercised significant control over Wilson's hiring, firing and/or conditions of employment at Ohio State.

329.     Bahnson is the agent of Ohio State.

330.     Ohio State, by and through Bahnson, discriminated against Wilson with respect to his terms, conditions, or privileges of employment, because of his sex. Plaintiff incorporates paragraphs 1-11, 21-74 and 84-107 as evidence of said allegation.

331.     Ohio State, by and through Bahnson, disparately treated men in comparison to women. Bahnson "eliminated" paternity leave for male employees in violation of Ohio State policies while taking no such action against maternity/paternity leave for female employees.

332.     Ohio State, by and through Bahnson, exposed men to disadvantageous terms or conditions of employment to which members women were not exposed. Plaintiff incorporates paragraphs 1-11, 21-74 and 84-107 as evidence of said allegation.

333.     The behavior of Bahnson towards male employees was severe and objectively offensive and created a hostile or abusive environment. Plaintiff incorporates paragraphs 1-11, 21-74 and 84-107 as evidence of said allegation.

334.     Wilson perceived the environment created by Bahnson and Ohio State to be abusive.

335.     Wilson reported the threats of Bahnson and complained to Bahnson's superior at Ohio State, but no actions were taken by Ohio State.

336.     Ohio State failed to exercise reasonable care to prevent and correct promptly Bahnson's harassing behavior.

337.     Ohio State admits in its own Case Report that Bahnson created a hostile work environment.

53

338.     Ohio State, by and through Bahnson, retaliated against Wilson for reporting Bahnson's harassing behavior to Ohio State and the ACGME. Plaintiff incorporates paragraphs 1-11, 21-269, and 306-312 as evidence of said allegation.

339.     Ohio State admits in its own Case Report that Bahnson discriminated on the basis of national origin.

340.     Wilson is entitled to recover damages, including punitive damages, costs and attorneys' fees, for harassing behavior of Bahnson and the hostile work environment perpetuated by Ohio State.

## COUNT V
## INTERFERENCE OF RIGHTS UNDER THE FMLA
### 29 U.S.C. § 2615 and § 2617
(Against Bahnson and Ohio State)

341.     Plaintiff incorporates paragraphs 1-11, 21-269, 306-312, and 325-339 as if fully restated herein.

342.     The Family Medical Leave Act ("FMLA") prevents employers from using the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.

343.     Ohio State employs approximately 43,630 individuals.

344.     Bahnson served in a supervisory position and exercised significant control over Wilson's hiring, firing and/or conditions of employment at Ohio State.

345.     Wilson availed himself of a protected right under the FMLA and notified Ohio State and Bahnson of his intent to take leave.

346.     Wilson was an eligible employee under 29 U.S.C.A. § 2611.

347.     Wilson was employed by Ohio State for at least 12 months and for at least 1,250 hours of service during the previous 12-month period before requesting leave.

54

348.     Ohio State, by and through Bahnson, interfered with, restrained, and/or denied Wilson's exercise and/or attempt to exercise his rights provided under the FMLA. Plaintiff incorporates paragraphs 1-11, 21-74 and 84-107 as evidence of said allegation.

349.     Ohio State, by and through Bahnson, discriminated and retaliated against Wilson for opposing the unlawful practices of Ohio State and Bahnson under the FMLA. Plaintiff incorporates paragraphs 1-11, 21-269, and 306-312 as evidence of said allegation.

350.     The violation of the FMLA by Ohio State and Bahnson denied Wilson and/or caused Wilson to lose compensation and/or employee benefits, including paid leave.

351.     Wilson suffered actual monetary losses as a direct result of the violation, including expenses related to child care.

352.     Wilson is entitled to recover damages, including interest, for violations of the FMLA by Bahnson and Ohio State.

## COUNT VI
## BREACH OF CONTRACT
### (Against Ohio State)

353.     Plaintiff incorporates paragraphs 1-11, 21-269, 306-312, and 325-339 as if fully restated herein.

354.     Ohio State maintains and publicizes to its employees certain policies governing employment.

355.     Ohio State's policies were terms of Wilson's employment.

356.     Ohio State's paid leave policy (Policy 6.27) states that eligible fathers are entitled up to three weeks of paid leave to care for and bond with a newborn or newly adoptive child. Policy 6.27 explicitly states, "Parental leave is a benefit of employment and its use must not have a negative impact on employment status or opportunities."  Furthermore, the policy states,

55

"Parental leave must be exhausted prior to the use of vacation leave or compensatory time when such leave is requested for the purpose of a birth or adoption event."

357.    Ohio State Policy 6.05 states in part "[t]he university will not interfere with an eligible employee's rights under the FMLA and will not discharge or otherwise discriminate against employees who exercise such rights."

358.    Ohio State Policy 1.10 prohibits harassment and discrimination.

359.    Ohio State materially breached at least Policy 1.10, 6.05 and 6.27. Plaintiff incorporates paragraphs 1-11, 21-269, 306-312, and 325-339 as evidence of said allegation.

360.    Ohio State's material breaches of contract deprived Wilson of earned employment benefits, including paid leave.

361.    Wilson is entitled to recover damages for the material breaches of contract by Ohio State.

## COUNT VII
## PROMISSORY ESTOPPEL IN THE ALTERNATIVE TO BREACH OF CONTRACT
(Against Ohio State)

362.    Plaintiff incorporates paragraphs 1-11, 21-269, 306-312, 325-339, and 354-359 as if fully restated herein.

363.    Ohio State maintains and publicizes to its employees certain policies governing employment.

364.    The policies promise benefits to employees such as Wilson.

365.    Wilson was aware of Ohio State's policies and relied on said policies in accepting and maintaining his employment at Ohio State.

366.    Wilson relied on the benefits stated in Ohio State's policies to his detriment in accepting employment at Ohio State.

56

367.    Ohio State expected to induce Wilson to accept employment at Ohio State with its state policies and benefits.

368.    Ohio State did not uphold its promises stated in its policies, such as paid leave, to the detriment of Wilson.

369.    Wilson is entitled to recover damages for Ohio State failing to perform its promised actions.

## COUNT VIII
## UNLAWFUL DISCRIMINATORY PRACTICES
### O.R.C. § 4112.02 and 4112.99
(Against Ohio State)

370.    Plaintiff incorporates paragraphs 1-11, 21-269, 306-312, and 325-339 as if fully restated herein.

371.    Bahnson served in a supervisory position and exercised significant control over Wilson's hiring, firing and/or conditions of employment at Ohio State.

372.    Bahnson is an agent of Ohio State.

373.    Ohio State, by and through Bahnson, discriminated against Wilson with respect to his terms, conditions, or privileges of employment, because of his sex. Plaintiff incorporates paragraphs 1-11, 21-74 84-107, and 325-339 as evidence of said allegation.

374.    Ohio State, by and through Bahnson, disparately treated men in comparison to women.  Bahnson "eliminated" paternity leave for male employees in violation of Ohio State policies while taking no such action against maternity/paternity leave for female employees.

375.    Ohio State, by and through Bahnson, exposed men to disadvantageous terms or conditions of employment to which members women were not exposed. Plaintiff incorporates paragraphs 1-11, 21-74 84-107, and 325-339 as evidence of said allegation.

376.    The behavior of Bahnson towards male employees was severe and objectively

offensive and created a hostile or abusive environment. Plaintiff incorporates paragraphs 1-11, 21-74 84-107, and 325-339 as evidence of said allegation.

377.      Wilson perceived the environment created by Bahnson and Ohio State to be abusive.

378.      Wilson reported the threats of Bahnson and complained to Bahnson's superior at Ohio State, but no actions were taken by Ohio State.

379.      Ohio State failed to exercise reasonable care to prevent and correct promptly Bahnson's harassing behavior.

380.      Ohio State admits in its own Case Report that Bahnson created a hostile work environment.

381.      Ohio State, by and through Bahnson, retaliated against Wilson for reporting Bahnson's harassing behavior to Ohio State and the ACGME. Plaintiff incorporates paragraphs 1-11, 21-269, and 306-312 as evidence of said allegation.

382.      Ohio State admits in its own Case Report that Bahnson discriminated on the basis of national origin.

383.      Wilson is entitled to recover damages, including punitive damages, costs and attorneys' fees, for harassing behavior of Bahnson, retaliation, and the hostile work environment perpetuated by Ohio State.

## COUNT IX
## INJUNCTIVE RELIEF
(Against All Defendants)

384.      Plaintiff incorporates paragraphs 1-11, 21-269, 306-312, 325-339, and 354-359 as if fully restated herein.

385.      Defendants have wrongfully disrupted Wilson's credentialing as an urologist

without justification.

386.     Box has indicated that Bahnson, Box and Ohio State intend to intentionally disrupt Wilson's future credentialing as an urologist without justification.

387.     On information and belief, Thomas is complicit with Bahnson, Box and Ohio State to disrupt Wilson's future credentialing as an urologist without justification.

388.     Wilson will be irreparably harmed if he is unable to be credentialed as an urologist based on the misrepresentations or malicious actions of Defendants.

389.     No third parties will be harmed by preventing Defendants' misrepresentations or malicious actions.

390.     The public interest will be served by preventing the misrepresentations or malicious actions of Defendants.  Wilson is a highly qualified, skilled surgeon who would be unjustly limited in practicing his specialty if the actions of Defendants are permitted.

391.     Wilson is entitled to injunctive relief preventing Defendants from taking negative actions against his future credentialing based upon his employment at Ohio State.

## COUNT X
## PUNITIVE DAMAGES
(Against All Defendants)

392.     Plaintiff incorporates paragraphs 1-11 and 21-391 as if fully restated herein.

393.     Defendants had knowledge of the harm that might be caused by their behavior.

394.     The behavior of Defendants was with actual malice, conscious, deliberate and intentional, with full knowledge of their impropriety and of the harm to the Plaintiff.  It is conduct which, in the interest of society, should be discouraged.

395.     Wilson is entitled to recover punitive damages and attorney fees for wrongful conduct of Defendants.

WHEREFORE, Plaintiff requests that this Court:

(a)        award Plaintiff compensatory damages as determined by the evidence at trial or by this Court;

(b)        order a permanent injunction preventing Defendants from taking negative actions against Plaintiff's future credentialing based upon his employment at Ohio State;

(c)        award Plaintiff punitive damages as determined by the evidence at trial or by this Court;

(d)        award Plaintiff  his reasonable costs and attorneys' fees

(e)        award Plaintiff costs and interest as allowed by law

(f)        award such other and further relief as this Court deems just and appropriate.

/s/ Robert D. Wilson
Robert D. Wilson
Attorney for Plaintiff
Ohio Bar No. 0003366

16716 Chillicothe Road, Suite 100
Chagrin Falls, Ohio 44023-4529
Telephone:  440-708-0445
Facsimile:  440-708-0511
E-mail:  rdwilson@wwcolpa.com

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury, in conformity with the provisions of Rule 38(b) of the

Federal Rules of Civil Procedure.

<u>/s/ Robert D. Wilson</u>
Robert D. Wilson

# EXHIBIT A



**THE OHIO STATE UNIVERSITY**

Office of Human Resources
Employee and Labor Relations
Suite 430
1590 N. High Street,
Columbus, OH 43201-2190
Phone 614-292-2800
Fax 614-292-0549

## CASE REPORT

**CONFIDENTIAL**

| | |
|---|---|
| DATE: | September 12, 2014 |
| TO: | Dr. Edmund Funai, Interim Dean, College of Medicine |
| FROM: | Kate Dillingham, Director of Human Resources, College of Medicine |
| | Christina Cunningham, Employee and Labor Relations Consultant, Office of Human Resources |
| RE: | Allegation of violation of Workplace and Family and Relationship Violence policy 7.05 against Dr. Robert Bahnson |
| | Allegation of violation of Sexual Harassment policy 1.15 against Dr. Robert Bahnson |
| | Allegation of violation of Affirmative Action, Equal Employment Opportunity and Non-discrimination/Harassment policy 1.10 against Dr. Bahnson |

### Allegations

On July 21, 2014, the Office of Human Resources (OHR) received an email document from Dr. Jeffrey Wilson, a physician who completed his residency at The Ohio State University Wexner Medical Center Department of Urology on June 30, 2014. In his email, Dr. Wilson made a number of allegations regarding the conduct of Dr. Robert Bahnson, Chair and Professor, Department of Urology. In particular, Dr. Wilson raised concerns about a recent situation in which he and two other graduated residents, Dr. Andrew Smock and Dr. David Ludlow, were notified that they could not take the American Board of Urology written board examination. Dr. Wilson, Dr. Smock and Dr. Ludlow were Chief Residents in Urology during the 2013/2014 academic year and graduated from the residency program as of July 2014. Dr. Wilson and his colleagues had registered for, and were expecting to sit for, their board certification exam with the American Board of Urology (ABU) in July 2014. Dr. Wilson claimed that on July 11, 2014, he received a communication from the PearsonVue testing center informing him that he could not sit for the exam, which was scheduled on the following Tuesday, July 15. After receiving this communication, he claims that he spoke with the secretary of the American Board of Urology, who informed him that the reason he could not take the examination was that the Ohio State Urology Department rescinded its previous recommendation that he could sit for the exam. Ultimately, all three residents were notified on Monday, July 14th that they could take their written Board examination. Dr. Wilson alleged that Dr. Bahnson schemed to prevent the three residents from taking the exam because Dr. Wilson and Dr. Smock took paternity leave during their last year of residency and because Dr. Ludlow took a personal day on the last day of residency. Additionally, Dr. Wilson alleged that "Dr. Bahnson has demonstrated a pattern of abusing his power and authority over residents on a continuous basis" and that Dr. Bahnson "uses intelligence, cunning, his national and regional influence, and numerous positions of power to manipulate, intimidate, and make others under him miserable."

On July 26, 2014, Dr. Wilson sent an email document to Dr. Michael Drake, Ohio State President and the State Medical Board of Ohio, detailing the same allegations as the July 21, 2014 letter to OHR, with some additional allegations.

Following is a list of the allegations from both letters:
1. Dr. Bahnson threatened residents to discourage them from taking paternity leave.
2. Dr. Bahnson threatens residents with reminders that he signs their certificate of graduation, signs off on hospital credentialing and signs off on permission to sit for Urology boards.

3. Dr. Bahnson has followed through on these threats (about signing off on certificates of graduation, credentialing and permission to sit for Urology boards) because residents complained to the American College of Graduate Medical Education (ACGME) on the annual residency survey.
4. Dr. Bahnson told two female residents to take birth control so they do not become pregnant.
5. A Urology staff member signed a resident up for payroll deduction to Ohio State without his consent.
6. There is high turnover among the clinic staff, because Dr. Bahnson targets them.
7. In 5.5 years, seven residents have quit or were fired or made to undergo inpatient psychiatric evaluation.
8. Just after the May 2014 ACGME results came out, Dr. Bahnson took away the ability for Chief Residents to set the Urology residents' schedule.
9. Dr. Bahnson sent an email to the new PGY2 residents saying "your predecessors have angered me."
10. Dr. Bahnson has instituted a "reign of terror" and has made all current residents meet with him individually to discuss "professionalism."
11. Dr. Bahnson was given a 4 year chairmanship renewal in June 2014.
12. Dr. Box does very little to advocate for residents and is under Dr. Bahnson's control.
13. Dr. Bahnson has refused to sign credentialing papers for former residents.
14. Dr. Bahnson berated a resident in front of others and made him stand up during conference.
15. Dr. Bahnson asked a resident humiliating and inappropriate questions about his personal life.
16. Dr. Bahnson is trying to destroy the careers of two attending physicians.
17. Dr. Bahnson made sexist comments to and about a pathologist.
18. Dr. Bahnson physically assaulted a resident in 2011 during a urology conference.

In addition to the above described letters, Dr. Wilson also complained to the American College of Graduate Medical Education (ACGME). In his complaint to the ACGME, Dr. Wilson raised a number of issues, including the following that are Human Resources in nature:

1. The Program Director threatens the residents' careers and makes them go to professionalism classes as punishment if the ACGME Resident Survey does not reflect the program in a positive light.
2. When Dr. Bahnson could not be Program Director and Chair at the same time, he made his wife program director.
3. In order to display his power, Dr. Bahnson constantly asks the residents: "Who's Your Daddy?"
4. When a German Student was visiting, Dr. Bahnson saluted her with "Heil Hitler!"
5. Dr. Bahnson will not issue resident recommendation letters for jobs in the area because he does not want the competition.

## Scope of the Investigation

The allegations were investigated by the Office of Human Resources and College of Medicine Human Resources. In the course of the investigation the following individuals were interviewed:

- Dr. Jeffrey Wilson, graduated resident from the Department of Urology
- Dr. Robert Bahnson, Chair, Department of Urology
- Dr. Geoff Box, Residency Program Director, Department of Urology
- Individuals interviewed included:
  - Seven current residents
  - Seven former residents, including Dr. Andrew Smock and Dr. David Ludlow
  - Five faculty members in the Department of Urology
  - Two faculty members from other departments
  - Three current staff members in the Department of Urology
  - Two former Urology clinic staff members
  - Dr. Andrew Thomas, Chief Medical Officer, The Ohio State University Wexner Medical Center

**Summary of Interviews**

Interview with Dr. Jeffrey Wilson

On July 29, 2014, Dr. Wilson was interviewed. He recounted the situation regarding sitting for his Urology boards that he described in his letters dated July 21, and July 26, 2014. He stated that he was scheduled to take his board exam on July 15, 2014, after previously scheduling to take his exam in April 2014. At the end of the day on June 30, which was his last day of residency, he received a good evaluation from Dr. Box. He planned to take two weeks to study for the board exam and then move to Pittsburgh to start a new position as a physician. The closing on his new home in Pittsburgh was scheduled for July 16, and Dr. Wilson claimed that the mortgage was contingent upon taking Part 1 of the board exam on July 15.

Dr. Wilson stated that on the morning of July 11, he received an email from the testing center in Columbus, where he was to take his exam. The email informed him that his exam was cancelled. Dr. Wilson stated that he also received a message to call ABU. When he reached Dr. Jordan at ABU, Dr. Jordan said that Ohio State had unilaterally rescinded its program letter that had recommended him for the board exam. Dr. Wilson stated that he contacted his fellow Chief Residents, Dr. Smock and Dr. Ludlow and learned that the same thing had happened to them. Dr. Wilson stated that Drs. Smock and Ludlow told him that the reason for the rescission of the recommendation letters was because Dr. Ludlow took a personal day on June 30, 2014, after all three residents were told via an email from Dr. Box that they were expected to work on that day.

Dr. Wilson stated that he was at work on June 30 and had seen patients with attending physicians. Dr. Wilson stated that Dr. Bahnson asked Dr. Wilson and Dr. Smock to see him that afternoon. Dr. Wilson stated that Dr. Bahnson asked them if they knew that Dr. Ludlow would not be at work that day. Dr. Wilson stated that he answered that he hadn't known. Dr. Bahnson responded by saying "If you are lying, your career is in trouble, you are in deep shit."

Dr. Wilson stated that his attorney faxed a letter to Dr. Bahnson on July 11, 2014. Review of this document from Wilson & Wilson Co., L.P.A. states in part "To avoid being sued, you have until the end of today to resubmit the program letter and Dr. Wilson must be allowed to sit for the boards as scheduled."

Dr. Wilson stated that he was able to sit for the board exam on July 15, as planned, but had to take it in Pittsburgh because the testing center in Columbus no longer had a place for him. Dr. Wilson stated that having to spend the weekend not knowing if he could take the board examination, and learning on Monday that he would have to take the examination in Pittsburgh the next day, caused him and his family much stress.

Dr. Wilson stated that during his PGY2 year, he informed Dr. Bahnson that he wanted to take paternity leave for the birth of his first child. Dr. Wilson stated that Dr. Bahnson said "No, I have eliminated paternity leave." Dr. Wilson stated that, when he indicated that paternity leave is a right under federal law, Dr. Bahnson became very angry. Dr. Wilson stated that he was petrified and eventually took his vacation week for the birth of his daughter in June 2011.

Dr. Wilson stated that when he informed Dr. Bahnson in 2014 that he wished to take paternity leave for the birth of his second child, Dr. Bahnson sent him a "please see me" email. Dr. Wilson stated that Dr. Smock had requested paternity leave at the same time and also received a "please see me" email from Dr. Bahnson. Dr. Wilson stated that only Dr. Smock went to see Dr. Bahnson, and further alleges that Dr. Bahnson told Dr. Smock that "Good surgeons don't take paternity leave" and "I have eliminated paternity leave." Dr. Wilson stated that he submitted a paternity leave form to Dr. Box and subsequently received a call from the Program

Coordinator, who said "Do you really want to do this? You may need to extend your training." Dr. Wilson stated that he took one week of paternity leave for the birth of his second child.

Dr. Wilson stated that in 2011, he witnessed Dr. Bahnson grab a resident by the arm during a conference, when there was a problem with the AV.

Dr. Wilson stated that Dr. Bahnson forced another resident to stand during conference and then berated him in front of others.

Dr. Wilson stated that Dr. Bahnson told residents not to talk with a certain pathologist, and made sexist comments about her and her behavior. He could not remember the exact comments.

Interview with Dr. Robert Bahnson

On July 25, 2014 and August 27, 2014, Dr. Bahnson, Chair and Professor in the Department of Urology, was interviewed. From these interviews, as well as documents provided by Dr. Bahnson, his account of the action to rescind the recommendation for Dr. Wilson, Dr. Smock and Dr. Ludlow is as follows:

Dr. Bahnson stated that Dr. Box sent an email on Friday, June 27, 2014 to Drs. Wilson, Smock and Ludlow indicating Dr. Box's expectation that the residents will be active participants in the work to be done on Monday, June 30, 2014. A copy of this email was provided to the investigators.

Dr. Bahnson stated that on June 29, 2014, Dr. Smock sent an email to the junior residents, changing the schedule to account for Dr. Ludlow not being there. A copy of this email was provided to the investigators.

Dr. Bahnson stated that on June 30, 2014, Dr. Ludlow sent an email to the Program Coordinator that he was sick and needed to take a personal day. A copy of this email was provided to the investigators. Dr. Bahnson stated that he then sent an email to Drs. Wilson and Smock to come see him. Dr. Bahnson stated that he asked them if they knew about Dr. Ludlow's plans to not be at work on June 30. Dr. Bahnson stated that they said no. Dr. Bahnson stated that he gave them another chance to answer and that they could be in deep shit. Dr. Bahnson stated that, again, Drs. Wilson and Smock answered no. Dr. Bahnson stated that he said "I guess someone is lying" and dismissed them from his office.

Dr. Bahnson stated that during the evening of June 30, he received an email from Dr. Ludlow, asking to come clean. A copy of this email was provided to the investigators. Dr. Bahnson stated that Dr. Ludlow indicated that no one else knew the details of his plans to leave Columbus for his new position in Utah and that Dr. Ludlow hoped to sneak out under the cover of darkness.

Dr. Bahnson stated that on Tuesday, July 1, he drafted a letter to the ABU to make Drs. Wilson, Smock and Ludlow inadmissible for certification by the ABU. Dr. Bahnson stated that he showed his letter to Dr. Box and wanted him to sign it. Dr. Bahnson stated that Dr. Box declined to sign the letter and suggested that they wait a week before sending it. Dr. Bahnson stated that the reason for delay in sending the letter was twofold: Dr. Bahnson was incensed about this situation with the chief residents, and he hoped they would apologize for their behavior. Dr. Bahnson stated that he and Dr. Box agreed to meet again in a week.

Dr. Bahnson stated that on Tuesday, July 1 he also had a phone conversation with Dr. Ludlow in which Dr. Ludlow insisted that no one else knew that he was not planning to come to work on June 30. Dr. Bahnson stated that he obtained, from a junior resident, a copy of an email from Dr. Smock on June 29 that made it clear that the resident schedule was being changed to accommodate Dr. Ludlow's absence. Dr. Wilson was copied

on this email. Dr. Bahnson provided a copy of this email to the investigators. Dr. Bahnson stated that it was clear that Drs. Smock and Wilson lied to him. Dr. Bahnson stated that he does not like it when people lie to him.

Dr. Bahnson stated that during the time between his drafting of the letter to the ABU and actually sending it, he talked by phone to Dr. Jordan from the ABU. Dr. Bahnson stated that he was a member of a previous ABU board and thought that such a letter would not necessarily result in the residents not being able to sit for their boards. Dr. Bahnson stated that Dr. Jordan told him that he (Dr. Jordan) thought it unlikely that the ABU would certify them if Dr. Bahnson didn't recommend them. Dr. Bahnson stated that Dr. Jordan also told him that if he did not recommend the residents, he (Dr. Bahnson) should put a remediation plan in place. If the residents completed the remediation, Dr. Bahnson could recommend them again in the future.

Dr. Bahnson stated that on July 8, he finalized his letter to the ABU and asked Dr. Box to sign it. Dr. Bahnson stated that Dr. Box did not want to sign that letter, but would send one of his own. Both letters were sent to the ABU by U.S. Mail on July 8. Dr. Bahnson's letter stated "Due to an egregious breach of professionalism and responses which followed, it is my opinion the following three former Ohio State University residents should be inadmissible for certification by the American Board of Urology. The individuals are David V. Ludlow, Andrew Z. Smock and Jeffrey R. Wilson." Dr. Box's letter stated "I write to inform you of a change in my recommendation to the American Board of Urology regarding the three graduates the The Ohio State University in June 2014, David V. Ludlow, Andrew Z. Smock and Jeffrey R. Wilson. Very recently they were all involved in an egregious breach in professionalism. It saddens me to write this letter, but this type of behavior is not tolerated at Ohio State and as such I would like to retract the prior recommendation made to the board regarding these candidates. Understanding that the ABU's duty is uphold the public's interest, I feel obligated to inform you of this issue."

Dr. Bahnson stated that on July 11 he had another phone conversation with Dr. Jordan from the ABU. Dr. Jordan confirmed receipt of Dr. Bahnson's letter and asked for a letter from the Program Director, Dr. Box. Dr. Bahnson stated that Dr. Jordan did not receive Dr. Box's mailed letter, so sent a PDF version to him.

Dr. Bahnson's statements regarding the other allegations raised by Dr. Wilson and ACGME are described with each individual allegation below.

Interview with Dr. Geoff Box

On July 25, Dr. Box, Residency Program Director and Assistant Professor in the Department of Urology, was interviewed. From this interview, his account of the action to rescind the recommendation for Dr. Wilson, Dr. Smock and Dr. Ludlow is as follows:

Dr. Box stated that Dr. Smock and Dr. Wilson had the opportunity to tell the truth about Dr. Ludlow, when confronted by Dr. Bahnson on June 30, and they lied. Dr. Box stated that the intent of the letters to the ABU were to make the Board aware of the serious breach in professionalism. Dr. Box stated that he wasn't sure what actions the Board would take as a result of the letters from Dr. Box and Dr. Bahnson; he thought the issue of the breach in professionalism would be addressed with the residents before their oral boards or that the ABU might cancel the residents' boards. Dr. Box indicated that he believed that the residents should be required to address these issues with the Board.

Dr. Box stated that Dr. Bahnson's letter was stronger than his and that if Dr. Bahnson hadn't sent a letter to the ABU, he wouldn't have either. Dr. Box stated that what he would/should have done differently is to address the issue with the residents directly, instead of going to ABU. He stated that his decision to send a letter to the

ABU grew out of discussions with Dr. Bahnson. Dr. Box indicated that he did recommend to Dr. Bahnson that they sit on the letter for a week.

Dr. Box's statements regarding the other allegations brought up by Dr. Wilson and ACGME are described with each individual allegation below.

## Summary of Witness Interviews

Witnesses were asked for their view of the overall culture for residents in Urology. Although positive comments and feedback were received regarding the culture for residents in Urology, some statements of concern were also provided, including the following:

- The culture is unnecessarily dictatorial, it should be more collegial.
- Threats are off-the-cuff and meaningless.
- Some days Dr. Bahnson is happy, some days are not a good day. When Dr. Bahnson is in a bad mood, you worry about bumping into him.
- Dr. Bahnson can be horrifying.
- The general feeling is to keep your head down around Dr. Bahnson.
- It's stressful for lots of residents, not the best atmosphere. People are fearful of retaliation.
- The best discussions at conference happen when Dr. Bahnson isn't there. When he is at conference, he attacks residents and attendings with condescending and disrespectful comments. No one wants to speak up when he is there.
- Emails from Dr. Bahnson are intimidating and threatening.
- Threats from Dr. Bahnson are legitimate.
- You can learn a lot from Dr. Bahnson, but people won't challenge him.
- Dr. Bahnson is "old school".
- Dr. Bahnson doesn't know where to draw the line.
- If you get on Dr. Bahnson's bad side, it's hard to get off.

Witnesses also made general statements regarding their concerns about the recent incident where last year's chief residents had their recommendation to take the ABU exam rescinded. A few statements of concern include:

- Now that the three residents had action taken against them, the fear has increased.
- The action taken against the three residents was retaliation and the punishment did not fit the crime.
- I would have expected due process in this case.
- Dr. Bahnson is powerful. He can do things to people without due process. This recent event is a total abuse of power.
- Those three residents did not deserve that treatment. They were good people.
- Everyone was shocked that the chief residents lied to Dr. Bahnson and made different plans to cover the schedule on June 30. Lying is a disappointment, but this was a harsh punishment – they have left the program.
- What happened to the chiefs made me lose hope.

Statements from two witnesses in particular are worth noting in more detail, as they are balanced and fair assessments of the ABU exam incident. One witness stated that residents learn a lot of things that they don't appreciate until they are on their own. Residents often complain about the amount of clinic time they are required to take, want to utilize more Physician Assistants, and complain about consults. Residents view these assignments as just service to the department, rather than a learning opportunity. Residents prefer to be in the

OR all of the time. The witness added that the personality of one or two disgruntled residents can affect the whole group, as they shape the culture for the rest of the residents. The witness stated that the last two groups of residents felt entitled to have their concerns addressed. The witness added that these residents were lazy – they passed work on to the junior residents, made the schedule and gave themselves the advantage, wouldn't help the junior residents on call and didn't always complete required paperwork. The witness stated that they just didn't live up to their potential. The witness stated that last year's chief residents lied about what happened on their last day of residency. In addition, the witness stated that they graduated from the program as qualified to be practicing urologists and not being able to take their boards was too harsh of a punishment in terms of the short timing (of the rescission of the program recommendation) before the board exam.

Dr. Andrew Thomas stated that Dr. Bahnson came to him on June 30 and was "hot" about the chief resident situation that had occurred that day. Dr. Thomas stated that he recommended to Dr. Bahnson some ways to address the unprofessional behavior of the former residents, including clicking a box for "unprofessional behavior" on future license applications for these former residents or indicating unprofessional behavior, with comments, on future credentialing applications. Dr. Thomas stated that Dr. Bahnson did not tell him that he was considering making them ineligible for the board exam. Dr. Thomas stated that the recommendation to sit for the boards is a yes or no decision, made at the time of graduation. Dr. Thomas stated that to actually rescind eligibility to sit for the boards is much more impactful. Dr. Thomas went on to say that he appreciated the sense of honor and professionalism that Dr. Bahnson expects and that Dr. Bahnson was trying to make a point, but the punishment was way too much.

As a result of Dr. Wilson's complaints, twenty-seven individuals were interviewed. The following paragraphs relate to particular allegations and the responses by individuals who were interviewed:

1. *Dr. Bahnson threatened residents to discourage them from taking paternity leave.*

   A number of witnesses stated that discouragement from Dr. Bahnson for taking paternity leave is a big issue for residents. It is an unwritten rule among residents that Dr. Bahnson does not like paternity leave, so when a resident requests paternity leave, Dr. Bahnson sends a request for the resident to see him in his office. It was reported that this creates stress for residents. Several witnesses stated that during these meetings with Dr. Bahnson, he would question a resident's ability to be a good surgeon, and would make comments such as "We eliminated paternity leave." or "We stopped doing that years ago." Witnesses stated that Dr. Bahnson wanted them to use a floating week of vacation and said "You may have to extend your residency." or "I strongly encourage you not to take paternity leave as it could affect your future." One witness stated that Dr. Bahnson made a veiled threat by saying "I thought we had to give you 3 weeks of vacation, but we are only required to give you 2 weeks. Isn't that interesting?" Another witness stated that when he asked for one hour off during the noon hour to attend an OB appointment with his wife, Dr. Bahnson said "If you are asking me, the answer is no." Another witness stated that he was allowed to take one week of vacation for the birth of his child, but was not allowed to take additional time.

   Dr. Bahnson stated that no one has ever been told that they couldn't take paternity leave, and the decision is ultimately the resident's. He added that a past resident took two weeks of leave and there were complaints about coverage of clinical services by the other residents. The perception was that paternity leave was just extra time off that other residents could not have taken advantage of. Therefore, it's an unwritten understanding that a resident should use the 3 weeks of vacation during the time needed to be off for the birth of their children.

A witness who is a faculty member with Urology stated that the ABU requires a resident to have 48 out of 52 weeks per year of training to complete a year of residency. The witness stated that while a resident is entitled to paternity leave, if the resident takes all of the vacation allotted to them plus time off for paternity leave, there is a risk of not completing enough weeks of training to advance to the next year of residency.

Another faculty witness stated that the pressure for residents to take vacation instead of paternity leave for the birth of a child is due to the burden that extra time off creates for their colleagues. He stated that Dr. Bahnson puts more pressure on the residents than on the faculty related to paternity leave.

Summary of Allegation #1: The investigators find the witnesses' testimony is credible regarding this allegation.

2. *Dr. Bahnson threatens residents with reminders that he signs their certificate of graduation, signs off on hospital credentialing and signs off on permission to sit for Urology boards.*

Many of the witnesses stated without hesitation that Dr. Bahnson intimidates and threatens residents. One witness stated that when he approached Dr. Bahnson to change the order of presentations in conference, Dr. Bahnson said to him "I'm assuming you are here to turn in your resignation; you know more about education than I do." Another witness stated that Dr. Bahnson threatened to cut off his balls. Another witness stated that after a patient complained about his care, Dr. Bahnson said to him "If that ever happens again, I will call up your future jobs and tell them not to take you." Another witness stated that he has heard Dr. Bahnson say in a group setting "Remember, I'm the one who signs your recommendation letter at the end of residency." Another witness stated that residents are concerned that if you piss off Dr. Bahnson, he will hold a grudge and block your credentialing. Another witness stated that he is terrified because he sees how Dr. Bahnson treats the faculty - he is unprofessional and makes fun of the faculty. Another witness stated that Dr. Bahnson is big on professionalism, but he is the most unprofessional person in the department. Another witness summed up Dr. Bahnson with a quote: "There is no greater evil in the world than that which wears the mask of virtue".

Dr. Bahnson denied the allegation that he threatens residents with reminders that he signs their certificate of graduation, signs off on hospital credentialing and signs off on permission to sit for the Urology boards.

Summary of Allegation #2: The investigators find the witnesses' testimony is credible regarding this allegation.

3. *Dr. Bahnson has followed through on these threats (about signing off on certificates of graduation, credentialing and permission to sit for Urology boards) because residents complained to the ACGME on the annual residency survey.*

Many witnesses had something to say about topic of the results of the ACGME survey and subsequent discussions. Witnesses stated that Dr. Bahnson and Dr. Box met with the residents after receiving the survey results. The results in 2013 showed that only 17% of the responses were favorable to the survey question about the ability of residents to raise concerns without fear of intimidation or retribution. Several witnesses stated that there is a fear of intimidation or retribution by Dr. Bahnson if questions or concerns are raised. One witness stated that in 2011, Dr. Bahnson yelled at the residents concerning a question on the ACGME survey about faculty being interested in residency education. Another witness stated that the residency program was trying to get approval from ACGME for another resident slot in

Urology.  The witness stated that Dr. Bahnson said to the residents in a group meeting "If the ACGME survey results weren't so poor, we would've gotten another resident."  The witness felt that the implication was that it was the residents' fault that another residency slot wasn't approved.  Another witness stated that, when the ACGME site visitors came to Ohio State to talk to the residents about the survey, the meeting between the residents and ACGME was located in a room adjacent to Dr. Bahnson's office.  The witness stated that the location of the meeting seemed to be intentional, and that "If we can't complain to the ACGME, then there is no one we can complain to."

Dr. Wilson stated, in an email to the investigators, that on 3/29/12 he and Dr. Bahnson discussed the effect of the ACGME survey.  "Dr. Bahnson was screaming, swearing, face bright red, standing up from his chair, and was shaking vigorously.  He and I did far more than "discuss" the effects of the ACGME survey.  Dr. Bahnson said the residents, including myself, are despicable people for putting him in this position due to truthfully answering the survey.  He said my actions and the actions of others have caused him considerable trouble, and that he now has meetings the next day with the hospital administration to explain his actions and aura of intimidation surrounding the Urology Department residency program. He said I was ruining his program and would pay for it."

Another witness stated that the residents are terrified of the survey and commented "What happens if we answer truthfully?"

Another witness stated that Dr. Bahnson blames the last two classes of residents for the survey results in 2013.  This witness stated that in 2011, Dr. Bahnson yelled at residents in conference and said he would root out the bad residents.

Another witness stated that Dr. Bahnson made it clear to the residents that poor results on the survey are detrimental to the department and the residency program.  The witness stated that Dr. Bahnson didn't understand the poor results, so he educated the residents about what the survey means.  The witness stated that Dr. Bahnson said "If any of you think faculty aren't interested in teaching, shame on you."  This was in reference to the question on the ACGME survey about faculty being interested in residency education.

Another witness stated that the residents met with Dr. Box about the survey, and Dr. Box said "You don't realize that by filling this out (in the way you have), you are hurting yourselves.  I will go over every question to interpret how you should answer."  The witness stated that Dr. Box is correct in that unfavorable responses to the survey will attract attention from the ACGME and could result in sanctions or restrictions to the residency program.

Another witness stated that last year's review of the survey during conference was awkward.  The witness stated that Dr. Bahnson chewed the residents out and called them ungrateful and stated that it was their fault that the fourth resident slot was not approved.

A witness who is a member of the faculty stated that residents have not been chastised due to the results of the ACGME survey; rather, the residents were told to take the survey seriously and to think through their responses.  The witness stated that people are bombarded by surveys and Dr. Bahnson wanted the residents to really pay attention to this one.

Dr. Box stated that the results of the ACGME survey were discussed with the residents and disappointment in the results was expressed.  Dr. Box stated that when he talked to the residents, no

problems or concerns regarding the program were raised. However, the survey shows that there are problems in the program.

Dr. Bahnson stated that in December 2011, when the first negative results were reported, he spoke up in Grand Rounds and said "You should be ashamed of yourselves over the low data scores that faculty aren't interested in education."

Summary of Allegation #3: The investigators find the witnesses' testimony is credible that Dr. Bahnson has chastised and threatened residents regarding the results of the ACGME survey.

4. *Dr. Bahnson told two female residents to take birth control so they do not become pregnant.*

The two female residents identified by Dr. Wilson were interviewed and did not corroborate this allegation.

Dr. Bahnson denied that he told any female residents to take birth control.

Summary of Allegation #4: The investigators find insufficient evident to substantiate this allegation.

5. *A Urology staff member signed a resident up for payroll deduction to Ohio State without his consent.*

One witness stated that he was aware that a staff member did a "bone headed" thing and signed a resident up for payroll deduction to Campus Campaign, without the knowledge of Dr. Bahnson. When this was discovered, the payroll deduction was stopped and the money was refunded to the resident. The staff member no longer works at Ohio State.

Another witness stated that Campus Campaign was important to the department. The witness stated that a staff member was hounding the residents to donate, even if only $5. The witness stated that he finally agreed to donate, but did not have cash on him that day. The witness stated that the staff member filled out the payroll deduction form for him, checking the "monthly" box instead of "one time" box by mistake. The witness stated that he signed the payroll deduction form without reading it, and then noticed after several months that $5 was coming out of his pay every month. The witness stated that he went to the staff member and said she made a mistake and shouldn't she look to see if she made this same mistake on others' payroll deduction forms. The witness stated that the staff member was rude to him by saying "That wasn't your signature on the form?" The witness stated that he was upset by this response from the staff member and wrote an email to the residents to tell them of the issue. The witness stated that in this email, he wrote "I won't give another dime" to Ohio State. The witness stated that at his six month review, approximately three to four months after he sent the email, Dr. Bahnson brought the issue up and then offered him the opportunity to train elsewhere. The witness stated that he felt that he was almost fired over the email incident. The witness stated that six months later, Dr. Bahnson apologized for chastising him over this incident.

Dr. Bahnson stated that the resident probably checked the box for monthly deductions, instead of for a one-time deduction. Dr. Bahnson stated that the resident sent an unprofessional email to the staff member, over something that Dr. Bahnson considered to be easily correctable. Dr. Bahnson stated that he chastised the resident for unprofessional behavior.

Summary of Allegation #5: The investigators find the witnesses' testimony is credible regarding this allegation.

6. *There is high turnover among the clinic staff, because Dr. Bahnson targets them.*

A witness stated that in recent years, the clinic has been very busy, has grown in numbers of physicians and staff, and has moved to a new facility. The witness stated that the clinic has gone through periods of chaos and dysfunction, but is settling down now.

Another witness stated that there were documented performance issues for some of the clinic staff who left Urology.

Summary of Allegation #6: There is insufficient evidence to substantiate this allegation.

7. *In 5.5 years, seven residents have quit, were fired or made to undergo inpatient psychiatric evaluation.*

A review of records from the GME office indicate that four residents left the Urology program during the last 5.5 years, including one who transferred to another Urology program, one who went to a residency program in another specialty, one who withdrew for family reasons and one who was dismissed.

Summary of Allegation #7: The investigators find that the data does not substantiate this allegation.

8. *Just after the May 2014 ACGME results came out, Dr. Bahnson took away the ability for Chief Residents to set the Urology residents' schedule.*

One witness addressed this issue by stating that the Chief Residents were making the schedule and giving themselves the advantage over junior residents.

Dr. Bahnson stated that Dr. Box made the decision to take on the responsibility of surgery scheduling for resident coverage because of ACGME requirements for equal balance and distribution of surgical cases between residents, and assignment of cases in a manner that promotes graduated responsibility in the OR.

Summary of Allegation #8: The investigators find that there were legitimate reasons for removing the ability of Chief Residents from setting the Urology residents' schedule.

9. *Dr. Bahnson sent an email to the new PGY2 residents saying "your predecessors have angered me."*

A review of documents provided to the investigators show that Dr. Bahnson sent an email on June 20, 2014 to the incoming PGY2 residents saying "Your predecessors have irritated me. Best you know of it. Not a good idea to follow their lead. Please see me if this won't fit your PGY-2 agenda. If you still want to be a part of the team send Katie and Dr. Box a note indicating you have read this and will conform."

Summary of Allegation #9: The investigators find the witnesses' testimony is credible regarding this allegation and is substantiated through documentation.

10. *Dr. Bahnson has instituted a "reign of terror" and has made all current residents meet with him individually to discuss "professionalism."*

Several witnesses stated that before individual meetings with Dr. Bahnson, he asked them to read an article on professionalism. The witnesses stated that aside from his expectation to wear a shirt and tie and be well-groomed, they weren't clear about how Dr. Bahnson defined professionalism. Witnesses stated that Dr. Bahnson said that "If you have a breach of professionalism, without warning, you will be placed on focused review, leading to probation and dismissal."

Witnesses stated that Dr. Bahnson makes threats such as "Be more prepared for journal club or I'll send you back to (your home state/country)" or "Come to work well-groomed and showered or I'll send you back to (your home state/country)."

Dr. Bahnson denied that he has instituted a "reign of terror." Dr. Bahnson said that when he came to Ohio in 1996, the residency program was "worse than a fetid pile of stool." He stated that his goal was to build the residency program into a flagship program, based on professionalism. He stated that the hallmark of professionalism is honesty, accountability for actions, put patient interests ahead of your own and meticulous personal hygiene. Dr. Bahnson stated that the residency program did reach his expectation of a flagship program at one time, but relative to the residency program today, "We've lost it, and we're going to get it back."

Summary of Allegation #10: The investigators find the witnesses' testimony is credible regarding the allegation that Dr. Bahnson has made current residents meet with him individually to discuss professionalism.

11. *Dr. Bahnson was given a 4 year chairmanship renewal in June 2014.*

Dr. Bahnson's Chair appointment has not been renewed as of the writing of this case report.

12. *Dr. Box does very little to advocate for residents and is under Dr. Bahnson's control.*

Several witnesses stated that they think Dr. Box's authority and accountability for the Urology residency program is limited. One witness stated that in some ways, Dr. Box is a puppet to Dr. Bahnson and there is fear that concerns brought to Dr. Box will be discussed with Dr. Bahnson and there will be retribution from Dr. Bahnson for raising a concern. Another witness stated that he thought Dr. Box would do things differently if he had more power. Another witness stated "He's just the messenger."

Another witness stated that if the residents push for something, Dr. Box says he needs to run it by Dr. Bahnson. The impression is that if Dr. Bahnson doesn't want something to happen, it won't happen.

Another witness stated that Dr. Box is Dr. Bahnson's "golden boy" and that Dr. Bahnson has Dr. Box wrapped around his finger.

Another witness stated that Dr. Box is Dr. Bahnson's favorite. Dr. Bahnson making Dr. Box the Program Director was only a paper move to placate the residents.

Another witness stated that Dr. Box answers to Dr. Bahnson; Dr. Bahnson has influence over Dr. Box and Dr. Box does what Dr. Bahnson tells him to do over what the residents want.

Another witness stated that Dr. Box doesn't listen to his moral compass when he carries out Dr. Bahnson's orders.

Several witnesses stated that the program is more open under Dr. Box than it was under Dr. Bahnson. Dr. Box has made some changes in the program that are appreciated, including the ability for PGY4 residents to take a board review course and changes in residency rotations for PGY4s to two months from four months.

Dr. Box stated that, while Dr. Bahnson makes most decisions of a financial nature, Dr. Box has never felt he hasn't had authority to make changes in the program. Dr. Box stated that he is in charge of the day-to-day schedule for residents and their education program. Dr. Box stated that Dr. Bahnson is a mentor to him and gets advice from him.

Dr. Bahnson stated that if Dr. Box makes a decision about the program, Dr. Bahnson has to follow his decision. Dr. Bahnson stated that he monitors the faculty to ensure compliance with residency educational policies.

Summary of Allegation #12: There is evidence to substantiate that Dr. Box has made some positive changes to advocate for residents. However, by Dr. Box's own statement, he wouldn't have sent a letter to the ABU regarding last year's chief residents if Dr. Bahnson hadn't done so (see Interview with Dr. Geoff Box on page 5 above). The investigators find that Dr. Box's statement and other witness testimony is credible regarding the allegation that Dr. Box is under Dr. Bahnson's control and has limited authority as Residency Program Director.

13. *Dr. Bahnson has refused to sign credentialing papers for former residents.*

One witness stated that he needed to obtain credentialing papers from Ohio State to practice at another hospital. The witness stated that the Chief Medical Officer at that hospital told him that he would not be granted privileges there, due to patient care issues reported from Ohio State. The witness stated that no such area was addressed in his final residency evaluation. The witness stated that the Residency Program Coordinator told him that the report of patient care issues was a mistake. The witness stated that he eventually was granted privileges after four months, based on feedback from a Fellowship Director in the Department of Urology.

Another witness stated that his medical license for another state was delayed by several months because Dr. Bahnson checked a box on the license application indicating that a complaint had been brought against the resident. The witness stated that he had never had a formal complaint made against him; therefore, Dr. Bahnson should not check that box on the application. The witness stated that he asked Dr. Bahnson multiple times to fix it; eventually Dr. Bahnson wrote a letter indicating that he misunderstood the question on the application.

Dr. Bahnson denied this allegation.

Summary of Allegation #13: While there were two instances involving mistaken or delayed licensing or credentialing matters, there is insufficient evidence to substantiate the allegation that Dr. Bahnson refused to sign credentialing papers.

*14. Dr. Bahnson berated a resident in front of others and made him stand up during conference.*

One witness stated that Dr. Bahnson forced a resident to stand during conference and that Dr. Bahnson berated that same resident in clinic for his appearance, performance and attitude.

One witness confirmed that the above allegation happened to him. The witness stated that he was on call for 96 hours and fell asleep during conference. He stated that Dr. Bahnson made him stand up for the rest of the conference.

Dr. Bahnson stated that he warned the resident on multiple occasions to get enough sleep so he could stay awake during educational conference. When the resident fell asleep at conference, Dr. Bahnson made him stand so that he would stay awake.

Summary of Allegation #14: The investigators find the witnesses' testimony is credible regarding this allegation.

*15. Dr. Bahnson asked a resident humiliating and inappropriate questions about his personal life.*

One witness stated that Dr. Bahnson asked him during a performance review "Would you be celibate for Urology?" The witness stated that he was dating a faculty member in another department, and Dr. Bahnson asked him "Have you cleaned up your love life?"

Dr. Bahnson denied that he asked anyone "Would you be celibate for Urology?" Dr. Bahnson stated that the relationship between the resident and the faculty member occurred at a time when there was great focus from main campus on the sexual harassment policy. He stated that any relationship between a student and a faculty member could not be tolerated.

Summary of Allegation #15: There is insufficient evidence to substantiate this allegation.

*16. Dr. Bahnson is trying to destroy the careers of two attending physicians.*

No witnesses gave examples that indicate Dr. Bahnson is trying to destroy the careers of any attending physicians.

Summary of Allegation #16: There is insufficient evidence to substantiate this allegation.

*17. Dr. Bahnson made sexist comments to and about a pathologist.*

While several witnesses stated that they heard Dr. Bahnson make sexist comments about this person, none gave a specific example.

Summary of Allegation #17: There is insufficient evidence to substantiate this allegation.

*18. Dr. Bahnson physically assaulted a resident in 2011 during a urology conference.*

See witness testimony and a summary of the allegation outlined in #21 below.

19. *The Program Director threatens the residents' careers and makes them go to professionalism classes as punishment if the ACGME Resident Survey does not reflect the program in a positive light.*

See specifics and the summary of the allegation outlined in #3 above.

20. *When Dr. Bahnson could not be Program Director and Chair at the same time, he made his wife program director.*

Most witnesses interviewed did not have sufficient information to answer this question, but many stated that Dr. McGarr (Dr. Bahnson's spouse) currently works in the department, is a helpful resource and people welcome her presence. Dr. Box stated that it could not possibly happen for Dr. McGarr to be the Program Director of the Urology residency program. Dr. McGarr is not a board-certified urologist.

A review of the records in PeopleSoft shows that Dr. McGarr is an Administrative Associate 1, reporting to Bob LaFollette, Urology Department Administrator. Her position description states that she plans, develops and oversees research, development and outreach activities for the Department of Urology.

Dr. Bahnson denied this allegation and stated that Dr. McGarr's role is removed from the residents.

Summary of Allegation #20: There is insufficient evidence to substantiate this allegation.

21. *In order to display his power, Dr. Bahnson constantly asks the residents: "Who's Your Daddy?"*

Six witnesses stated that at a conference 3-4 years ago, a resident was in charge of setting up the AV equipment for the conference where many people were present, including medical students. The resident was having difficulty with the equipment. The witnesses stated that Dr. Bahnson was angry and they observed him grab the resident's arm and swing him around. The witnesses stated that they heard Dr. Bahnson berate the resident with a raised voice and asked him "Who's your Daddy?"

One witness confirmed that the incident described above happened to him. The witness stated that Dr. Bahnson was mad with the AV malfunction and grabbed his arm in anger and said "Who's your Daddy?" The witness stated that there were resident applicants present in the room who observed this incident. The witness stated that while it was unusual for Dr. Bahnson to grab someone's arm, it was par for the course to say "Who's your Daddy?"

Another witness stated on a separate occasion, Dr. Bahnson asked him "Who's your Daddy?" The witness stated that this was not made in a joking manner, but was an assertion of Dr. Bahnson's power and authority because he forced the witness to respond. The witness stated that Dr. Bahnson glared at him until he said "Dr. Bahnson, you're my Urology daddy." The witness stated that Dr. Bahnson replied "That's right, I'm your Daddy."

Dr. Bahnson denied the allegation that he has ever commented to a resident "Who's your Daddy". He also denied the allegation that he ever grabbed a resident's arm and swung him around during conference.

Summary of Allegation #21: The investigators find the witnesses' testimony is credible regarding this allegation.

*22. When a German Student was visiting, Dr. Bahnson saluted her with "Heil Hitler!"*

Two witnesses stated that they observed this action by Dr. Bahnson.

Several witnesses described incidents in which Dr. Bahnson was in a patient room with patients and physicians of eastern Indian descent and said "There is a toxic level of Indians in this room".

Dr. Bahnson denied that he saluted a German student with "Heil Hitler." Dr. Bahnson stated that he has made the statement "There is a toxic level of Indians in this room." Dr. Bahnson denied making this comment in front of patients. He also stated that he jokes that he would like to change the name of the American Urological Association to the American Indian Urological Association because of the number of Indians in the field of urology. Dr. Bahnson stated that he is "like Mel Brooks - an equal opportunity offender."

Summary of Allegation #22: The investigators find the witnesses' testimony is credible regarding this allegation.

*23. Dr. Bahnson will not issue resident recommendation letters for jobs in the area because he does not want the competition.*

One witness stated that, while he has often received notices of Urology physician positions from other states, he has never received such a notice about positions in central Ohio.

Dr. Bahnson denied this allegation.

Summary of Allegation #23: There is insufficient evidence to substantiate this allegation.

**Findings and Conclusion**

**Allegations of Inappropriate Behavior/Workplace Violence**

Pursuant to the university's Workplace and Family and Relationship Violence Policy 7.05 examples of conduct or behavior not tolerated by the university include, but are not limited to:

    A. Direct or implied threats.
    B. Physical conduct that results in harm to people or property.
    C. Possession of deadly weapons on university property.
    D. Intimidating conduct or harassment that disrupts the work environment or results in fear for personal safety (e.g. stalking).
    E. Use of university property or resources such as work time, telephones, fax machines, mail, e-mail, internet or other means to threaten, harass or abuse someone.

A review of testimony was completed by the investigators. The witnesses' testimony substantiated the allegations that Dr. Bahnson has made direct or implied threats to members of the Department of Urology. In addition to being a violation of university policy, by making threats about future employment, recommendation letters, and taking paternity leave, Dr. Bahnson has behaved in a way that is in conflict with the University's values of Integrity, Openness and Trust; and Empathy and Compassion. As a Chair and leader within the department and College of Medicine, Dr. Bahnson should exemplify those values and create a workplace where employees are comfortable raising concerns without retaliation.

The investigators find that there is a pervasive fear in the Department of Urology that Dr. Bahnson will follow through on his threats. The result of Dr. Bahnson's action to rescind the recommendation for last year's chief residents to sit for their ABU exam is that the culture of fear and intimidation in the Department of Urology has significantly increased. There is sufficient evidence that Dr. Bahnson's behavior is consistent with a hostile work environment, which exists when an employee experiences workplace harassment and fears going to work because of the offensive, intimidating, or oppressive atmosphere generated by the harasser.

The investigators also find that the mechanisms in place through the Residency Program to protect residents did not function as intended. The impact of Dr. Box's lack of authority as Residency Program Director is that there has been no buffer between residents and Dr. Bahnson's intimidating behavior.

In addition, witness testimonies substantiate the allegation that Dr. Bahnson made physical contact in a threatening manner with a former resident. This type of behavior is a direct violation of university policy and is unacceptable. Based on the witnesses' testimony of direct and implied threats, physical contact of an aggressive nature and intimidation that has disrupted the work environment in the Department of Urology, the conclusion of the investigation is there is a finding of **sufficient evidence** of a policy violation as it relates to the university's **Workplace and Family and Relationship Violence Policy 7.05**.

### Allegations of Sexual Harassment

Pursuant to the university's Sexual Harassment Policy 1.15 examples of sexual harassment include, but are not limited to:

    A. Some incidents of physical assault.

    B. Direct or implied threats that submission to sexual advances will be a condition of employment, work status, promotion, grades or letters of recommendation.

    C. Direct propositions of a sexual nature and/or subtle pressure for sexual activity that is unwanted and unreasonably interferes with a person's work or academic environment.

    D. A pattern of conduct that unreasonably interferes with the work or academic environment (not legitimately related to the subject matter of a course) including:

        1. Sexual comments or inappropriate references to gender.
        2. Sexually explicit statements, questions, jokes or anecdotes regardless of the means of communication (oral, written, electronic [e.g. email, social media, phone, etc.], etc.).
        3. Unwanted touching, patting, hugging, brushing against a person's body or staring.
        4. Inquiries and commentaries about sexual activity, experience or orientation.
        5. The display of inappropriate sexually oriented materials in a location where others can view them.

A review of testimony was completed by the investigators. The witness testimony conflicted with Dr. Bahnson's testimony. The allegations that Dr. Bahnson inappropriately asked a resident about his personal life and sexual activity could not be corroborated. As such, the conclusion of the investigation is there is a finding of **insufficient evidence** of a policy violation as it relates to the university's **Sexual Harassment Policy 1.15.**

### Allegations of Discriminatory Behavior

Pursuant to the university's Affirmative Action, Equal Employment Opportunity and Non-discrimination/Harassment policy 1.10, harassment is defined as "Verbal, non- verbal or physical conduct constitutes harassment if it is based on a person's protected status and creates an intimidating, hostile, or offensive work or academic environment that unreasonably interferes with work or academic performance or negatively affects an individual's employment or academic opportunities. Harassment can occur between any

individuals associated with the university, e.g., an employee and a supervisor; coworkers; faculty members; a faculty, staff member, or student employee and a customer, vendor, or contractor; or a student and a faculty member. Ohio State is committed to providing a workplace that is free of harassment based on age, ancestry, color, disability, gender identity or expression, genetic information, HIV/AIDS, status, military status, national origin, race, religion, sex, sexual orientation, or veteran status, is prohibited."

A review of testimony was completed by the investigators. The witness testimonies substantiated the allegations that Dr. Bahnson engaged in harassment by making multiple comments relating to national origin. This behavior is in conflict with the University's value of Diversity and is unacceptable because it is not conducive to creating a workplace of choice. Therefore, the conclusion of the investigation is there is a finding of **sufficient evidence** of a policy violation as it relates the university's **Affirmative Action, Equal Employment Opportunity and Non-discrimination/Harassment policy 1.10.**

**Action Steps**

In accordance with university policies, the allegations brought forth in regard to Dr. Robert Bahnson have been fully investigated by the Office of Human Resources. As a result, the following actions are recommended:

1. All parties are formally notified that they cannot retaliate and/or request explanations or rationale from persons in relation to the statements gathered during this investigation or their participation in this investigation.
2. The Office of Human Resources recommends that the College Medicine take appropriate corrective action and to consider these findings in accordance with the Rules of University Faculty; Chapter 3335-5-04.

These action steps are final. If you have any questions or concerns, please feel free to call the investigators.

Kate Dillingham
Director of Human Resources, College of Medicine and Office of Health Sciences

Christina Cunningham
Employee & Labor Relations Consultant

# EXHIBIT B



July 14, 2014

Dear Dr. Bahnson and Dr. Box,

I, Jeffrey Wilson, agree to provide a letter of apology for a serious breach of professionalism and for compromising the integrity of the urology program at The Ohio State University.

I agree to register and successfully complete an approved course on medical professionalism.

I understand the seriousness of my behavior leading to the breaches of professionalism.

This agreement was not made under duress and is of my own free will.

_____

Jeffrey Wilson, MD

Department of Urology                    915 Olentangy River Rd,        614-293-8155 phone
                                         Suite 3100                     614-293-3565 fax
                                         Columbus, OH 43212             www.urology.osu.edu

# EXHIBIT C

To Whom It May Concern at The American Board of Urology:

I wish to inform you of concerning conduct on the part of two of your members, Dr. Robert Bahnson and Dr. Geoffrey Box.   I just graduated from a 5 year residency in Urology at The Ohio State University Department of Urology.  My Chairman is Dr. Robert Bahnson and my Program Director is Dr. Geoffrey Box. You should be made aware of a recent concerning situation, where violations occurred on the part of the Ohio State Department of Urology against me and my two co-chief residents, Drs. David Ludlow and Andrew Smock.  These violations were caused in particular by Drs. Bahnson and Box.  I will first recount this incident, and then provide some history and background in subsequent paragraphs to shed light on a history of inappropriate conduct, including intimidation, personal revenge, resident mistreatment, unethical behavior, weaponization of the core competencies of the ACGME, and behavior that egregiously does not serve the purpose of training urology residents, which has been going on for some time.

David Ludlow, Andrew Smock, and I were scheduled to take the urology board certification examination on either Monday, 7/14/2014 or Tuesday, 7/15/2014 at a local PearsonVue testing center.  The test is part one of two for the urology board certification by the American Board of Urology (ABU).  The materials required to sit for the exam included a notarized application, supporting documents, a $1,300 fee paid by the candidate, and a Program Director's letters confirming residency status.  The application materials were due on 11/1/2013.  All of my materials were confirmed to be present from before 11/1/2013.  I also received a letter from the ABU on 4/1/2014 that "I am pleased to advise you that you are admissible to the 2014 Qualifying (Part 1) Examination of the American Board of Urology to be administered at Pearson VUE test centers throughout the United States."  The letter further instructed me to schedule my test after 5/1/2014.  Therefore, on 5/7/14 I scheduled my test for Tuesday, 7/15/2014.  I also scheduled the closing of my new home in Pittsburgh for the day after, 7/16/2014.  My home mortgage was a physician loan, with very specific stipulations about my job as a urologist and board certification that I had to sign were true.  One of these specific conditions was to take Part 1 of the Urology Boards on 7/15/14.

I began studying for the urology board test in June 2014, and thereafter on a full time basis (7 days a week) commencing 7/1/14.  I deliberately took two full weeks off from my future job to devote to exam preparation.  My studies were going well until Friday, 7/11/14 at 10:50am (one business day before the test) when I received an unexpected email from the PearsonVue testing center that my exam had been canceled.  This was the Friday before my Tuesday exam.  Bewildered, I checked my cellphone to see if there were any messages.  At this point, I thought this had to be a mistake.  However, a 10:58am a message from the ABU instructed me to call them urgently.  The ABU secretary informed me the cancellation of my test was no mistake.  I asked what was going on, and she said the Executive Secretary Dr. Gerald Jordan would speak to me regarding the matter, but he was in a meeting until noon.  I called the ABU back at 1pm after not hearing from him, and was told he was still busy.  At 1:55pm, Dr. Jordan contacted me.  He said I could no longer sit for the exam because Ohio State Department of Urology unilaterally had rescinded my program letter in the mid morning on Friday, 7/11/14 (that morning).   Dr. Jordan said he could give me no further explanation, and I would need to inquire with my program at Ohio State.  He also said there was nothing the ABU could do, as per policy they require a complete file in order to take the exam.  Dr. Bahnson knew this policy, as he was Vice President of the ABU the year before.  My file was complete from 11/1/13 until 7/11/14, and now, suddenly, the business day before the exam, it was incomplete without any prior warning or explanation given to me.

At this point, I spoke with my two co-residents at Ohio State, Drs. Ludlow and Smock, who informed me the same thing had happened to them. They were told by Ohio State Department of Urology the reason for rescinding our program letters was that David Ludlow had taken a personal day on the last day of residency on Monday, 6/30/14. To give some background, we were informed by both Drs. Box and Bahnson in the afternoon on Friday, 6/27/14 via email that all three chiefs had to work on Monday, 6/30/14. Dr. Ludlow, for reasons known to him, took a personal day for Monday, 6/30/14. According to the Ohio State University Handbook, residents may take a set number of personal days without cause per year. It is my understanding that Dr. Ludlow had not taken any personal days during the 2013-2014 year of residency. Yet, all three chiefs were being held responsible and accountable for Dr. Ludlow's personal day for no reason. I had worked a full day on Monday, 6/30/14 in the clinics of Drs. Lowe, Knudsen, and Begun from 7:45am until nearly 6pm. There are numerous patient notes in our electronic medical record to substantiate this fact. I attended a meeting called by Dr. Bahnson with Dr. Smock just before 1pm on 6/30/14. During the less than two minute meeting, Dr. Bahnson asked me three questions. First, he asked me if I knew David Ludlow was not going to be at work that I day. I replied, "no." Dr. Bahnson then asked me if I had received an email from him and Dr. Box on that past Friday, requiring me to be at work today, Monday, 6/30/14. I replied, "yes." Finally, Andrew Smock said he had seen David Ludlow at an operating room staff get together to celebrate our graduation this past Saturday. I also said I was at the celebration. The meeting ended with Dr. Bahnson threatening me that my career is on the line. I then went to afternoon clinic from 1pm until 5:45-6pm, until all patients were seen. I was the last resident to leave clinic that day, along with Dr. Smock. Before the day was complete on 6/30/14, I received a copy of my final residency review from Dr. Box. The review was stellar, saying I was a competent urologist in all facets and will make a high quality urologist. There was nothing negative at all on the review. I have kept the copy of the review. My mid chief year review and rotational reviews were similarly excellent, and I have copies of these too.

On 7/11/14, after losing my ability to take the boards, I gave Dr. Box a call to try to get an explanation for these events at 3:02pm on 7/11/14. I left a voicemail on his personal voicemail to please call me about this situation. I then tried to call Dr. Bahnson's office, and was similarly unable to get a hold of him. At this point, I still had received no communication whatsoever from Ohio State Medical Center or the Department of Urology. In fact, I had no contact with the Ohio State Department of Urology since 6/30/14, my last day of work. I was running out of time to reschedule the test. Given the sudden and personally damaging nature of the day's events, the lack of due process, and the lack of communication from Ohio State Department of Urology, I contacted a lawyer and had a cease and desist letter sent to Dr. Bahnson and Dr. Box. I also communicated via email with Dr. Box in the morning on Saturday, 7/12/14, in an effort to have him send back the program letter, so I could sit for urology board exam. I have yet to receive any communication from Dr. Bahnson, Dr. Box, Ohio State or the Department of Urology regarding this matter, and have never been directly told the rationale for their malicious and injurious actions toward me.

On Monday 7/13/14, I called the ABU and PearsonVue Testing Center to verify my inability to take the exam, which they re-verified that I could not take it. Drs. Smock and Ludlow communicated with the Ohio State GME in the morning as well. I anxiously awaited a response to my prior voicemails and emails to Drs. Bahnson and Box. Dr. Smock visited Dr. Bahnson and Dr. Box at their first availability, which was about 1pm on Monday. The meeting did not end with any change to our ability to take the test. At this point, it was 2pm EST on the Monday before the Tuesday test at 8am. Dr. Smock and Ludlow were supposed to take the test on that Monday, so their test opportunity was already over.

Finally, the Ohio State legal department contacted my lawyer at 2:40pm on Monday to say Ohio State was working to release me to take the exam.  However, as a condition for me to take my test, Dr. Bahnson wanted me to sign a letter containing blatantly false statements, including that I committed serious professionalism violations and I was signing under "no duress and of my own free will."  The letter also stated I was to complete a professionalism course with length and time commitment to be determined by Dr. Bahnson.  I declined to sign a letter with false statements.

After hearing nothing from the ABU, PearsonVue, or Ohio State, I once again called the ABU and was told I was still not able to take the test yet.  I then called PearsonVue testing center at 3:25pm, and was told I was just released minutes before to sign up for the test for tomorrow.  However, PearsonVue told me all testing centers in Ohio were now unavailable, as someone else had taken my spot in Columbus.  Athens, Cleveland, Lorain, Dayton, Cincinnati, Columbus, South Columbus, Toledo and everywhere else in the state of Ohio were now unavailable.   Before this action by Ohio State Department of Urology, I had been scheduled at a testing center located 0.8 miles, and a 1-2 minute drive, from my home in Westerville, OH.  I had delayed moving and packing my house, and had entered into a home rental agreement in Columbus in order to take the test in Columbus.

Now, I was forced at 3:45pm on Monday, 7/14/14 to sign up for the test in Pittsburgh, PA, located 3 hours 20 minutes from my house, as one testing Center in Pittsburgh had an availability by chance.  I had to pack my things, find a hotel in Pittsburgh which was very expensive on short notice, and frantically drive to Pittsburgh.  My wife had to drive and take our three month old baby in order for me to try and study in the car.  I arrived in Pittsburgh past 9pm, with the arrival time for my test being at 7:30am the next day.  I had no chance to study on Monday, and due to all the stress and phone calls to try to resolve this situation, I did not study on Friday, Saturday, or Sunday either.  I was planning considerable study time on Friday, Sunday, and Monday.  I did end up taking the test on Tuesday in Pittsburgh, and I know this situation very adversely affected my performance.  I just hope I passed.  My co-chiefs had to take their tests in Charleston, WV instead of Columbus, and San Diego, California instead of Las Vegas, NV.  Both Drs. Smock and Ludlow had to similarly scramble to find and drive to the test last minute, due to lack of availabilities.  Both incurred unnecessary driving and hotel expense as well, not to mention stress and lost study time solely due to the inexplicable actions of Dr. Bahnson and Dr. Box.

This incident had profound effects on me, my colleagues, and my family.  I lost 4 pounds from Friday until Tuesday from not eating.  The stress level was intense.  My wife and mother could not sleep.  I nearly lost my house in Pittsburgh, as my home loan was a physician loan and underwriting said I had to take this test on 7/15 in order to close on my house on 7/16.  In fact, I was convinced my house was lost.  Due to the requirements of my mortgage, the bank would have pulled funding, had I been forced to tell them the test was not taken.  Additionally, my wife and I lost several days to pack our home because of this incident, causing an immense amount of stress to move out of our home in Columbus in time.  We had a strict deadline to move of Saturday, 7/19/2014, due to hiring movers and being required to turn our home in Columbus over to the new buyer.  Moreover, I did significantly worse on the exam, and just hope I barely passed.  I lost valuable study time not only for the test, but also as a urologist studying to better my knowledge to provide enhanced patient care.  I was intimidated, concerned, bewildered, and unable to engage in activities to make me a better physician and urologist.

The above incident is certainly not the first time Dr. Bahnson has been involved in disruptive, malicious, excessive, and problematic behavior.  He has threatened and intimated me and residents Andrew Smock, Ryan Novak, and Brent Carlyle against taking paternity leave in violation of OSU

employment policy.  Every time we tried to take paternity leave, we received a "please see me" email from Dr. Bahnson.  During these "please see me" meetings, he made outrageous statements such as "good surgeons don't take paternity leave," that he has "eliminated paternity leave" and he will reduce our vacation from three weeks to two weeks if too many residents take paternity leave.  He also said he would look into extending our training, if possible.  He also makes veiled threats saying he won't believe we are "competent surgeons" if we take paternity leave, and that we have to remember he signs our certificate of graduation at the end of our training.  Moreover, Dr. Bahnson has reminded me on several occasions he is the person to sign off on all future hospital credentialing, and the one to permit me to sit for the urology boards.  This, of course, is another thinly veiled threat, and was made to and in the presence of other residents, including Ryan Novak.  He then made good on this threat when he tried to prevent Dr. Smock and I from taking the boards on 7/15/2014.  Both Dr. Smock and I were warned by Dr. Bahnson not to take paternity leave this year via a "please see me" email.  We then angered Dr. Bahnson by taking one week of paternity leave each, after the birth of our children in April and May of 2014.  It should be noted my son was born urgently, 3.5 weeks prematurely, and was in the NICU at Ohio State for 1 week.  My wife needed help, as we also have a three year old daughter, and no family in the Columbus area.  Because of taking paternity leave, Dr. Bahnson schemed to prevent us from sitting for the exam.  Dr. Smock and I were the only chief residents at Ohio State I know who worked on 6/30/14 in any surgical specialty; Dr. Bahnson attempted to prevent us from sitting for the boards because one of our co-chief residents took a personal day.  This behavior is preposterous and blatantly unethical.  Any one of the above residents could verify these claims.  Dr. Bahnson has demonstrated a pattern of abusing his power and authority over residents on a continuous basis.

Dr. Bahnson's intimidating, malicious, unprofessional, and unethical behavior certainly does not stop there.  He has told female residents Samiha Nasser and Asha White they are to take birth control so they do not become pregnant.  It has come to my attention Dr. Bahnson informed Samiha Nasser she was to "come to my office and take birth control, or be fired."  TJ Morris told me he transferred to the University of Louisville for the sole reason that he felt Dr. Bahnson was making things up about him, ruining his reputation, and was going to ruin his career.  Erin Akar was a resident fired on 6/30/14.  Both Drs. Morris and Akar supposedly have a "long paper trail" to support Dr. Bahnson's actions, but I believe both feel they were targeted.  Dr. Bahnson also told me he had a long paper trail on me in 2011, but I was also of the belief he was trying to find any and every excuse to put me in a bad light and ruin my reputation and career as he threatened on numerous occasions.  I felt so strongly about this in 2011, that I had my fellow residents write a letter on my behalf to the GME, which they did, and I also wrote a multi-paragraph letter to Ohio State's GME to document Dr. Bahnson's behavior.  I also met with the GME.   I have a copy of this letter, and a copy of the resident's letter on my behalf is on file at the Ohio State GME office.  Dr. Bahnson said in 2011 he was very angry with me, and the residents for "complaining" to the ACGME on the annual resident survey.  He said publically we were "bad residents" and said he was going to "extirpate" the bad residents in the program.  This was over a supposedly anonymous survey.  His berating of the residents was directly after the ACGME survey results came out.  He proceeded to terrorize the residents, including myself, in order to intimidate us into never "complaining" to the ACGME again.  He used principles of "ethics" and "professionalism" to come up with reasons to call us into his office, then threatens us.  Every time, it was due to a "professionalism" concern, but we knew it was a statement by Dr. Bahnson.  That statement was, "Complain to the ACGME, and I'll make you miserable."

Dr. Bahnson has a concerning history of preventing his graduated residents from obtaining hospital credentialing and board certification, due to maliciousness, spite, and vengefulness.  Humberto Martinez was a resident who graduated in 2013, whom the department of urology refused to sign his

hospital credentialing papers for moonlighting or made comments to his hospital causing him to have credentialing denied.  He went to a fellowship at Loyola, and he was going to moonlight at a local Chicago hospital.  However, Ohio State gave him a negative review at his credentialing papers, and he was denied privileges.  Ohio State, specifically Dr. Box, said it was a "mistake," but this "mistake" was never corrected.  Dr. Martinez spoke out about the malignant nature of Ohio State while a resident.  In fact, he was one of the most outspoken regarding his concerns with the program.  He considered suing Ohio State, but was fearful they would ruin the rest of his career.  Dr. Martinez was voted the pediatric surgery resident of the year and had a track record of superior performance throughout his residency.  There was no legitimate reason to deny his credentialing, except to send a message to the other residents.  That message being, "If you speak out about Ohio State Urology, we will prevent you from working as a urologist."  Moreover, Dr. Andrew Smock and I witnessed a startling incident whereby Dr. Bahnson physically assaulted Dr. Martinez in 2011, during a urology conference.  Dr. Bahnson became angry at Dr. Martinez, forcefully grabbed him by the shirt collar, spun him around, and then pinned him against a wall.  Dr. Bahnson then asked him, "Who is your Daddy?"  Dr. Martinez was stunned.  Dr. Bahnson then screamed, "I'm your Chairman, remember that!"  I was just notified by the current residents Dr. Bahnson threw his lunch at two current residents and screamed at them just this week.

Dr. Martinez is one of many graduated residents Dr. Bahnson prevented from obtaining hospital credentialing and board certification.  Dr. Matthew Johnson graduated from the program in 2013, and Dr. Box and Bahnson refused to sign various hospital credentialing papers that delayed Dr. Johnson's ability to work by months in 2013.  In fact, Dr. Johnson was of the opinion they were never going to allow him to work, so he contacted a lawyer and threatened to sue the department.  Only then did Dr. Bahnson and Box certify him.  Dr. Johnson was maliciously and repeatedly targeted during his residency at Ohio State by Dr. Bahnson.  Dr. Bahnson bereted him in front of me and many others several times, and made him stand up during conference to humiliate him.  Moreover, Dr. Bahnson called him into his office on multiple occasions with "please see me" emails, asking him humiliating and inappropriate questions about his personal life.  Dr. Johnson threatened a sexual harassment lawsuit at the time and reported Dr. Bahnson to the GME, in order to stop this unethical behavior from Dr. Bahnson.  Dr. Johnson has kept meticulous records of these incidences.  Dr. Johnson, Dr. Martinez, and I noticed our rotational reviews by the Department of Urology became much worse, after we voiced concerns with unprofessional behavior within the department.

In 2011, Dr. Smock was attacked by Dr. Bahnson, after he noted his pay was being reduced by monthly "donations" to Ohio State Medical Center, without any consent from him.  Dr. Smock discovered this when he examined his payroll statement.  Somehow he was signed up to have monthly deductions in his pay by an Ohio State Urology employee, Better Chasser.  When Dr. Smock found out about this, he sent an email stating that he wouldn't donate to Ohio State Urology again.  Dr. Bahnson sent him a "please see me" email, threatened his career, asked him to voluntarily leave the program, and told him that he was very disappointed in him.  This incident was internally reviewed by the Ohio State Medical Center.

Dr. Bahnson also has a well-documented history of maliciously targeting clinic staff and even attending physicians.  Several clinic staff left in the past year, and each one has specifically mentioned being targeted by Dr. Bahnson as the reason.  I can provide more names if needed, but these include Theresa Leo, Jada Hendrick, and Amy Fisher.  There are at least two others whose names I can't remember who left due to being maliciously targeted, and I'm sure the staff would provide their names if anonymously questioned.  The clinic staff was like a revolving door due to so many people quitting or being fired for seemingly unjustifiable reasons.  I worked with these people daily, and can verify their

performance was good.   They disclosed to me Dr. Bahnson used sexist and even racist remarks, which they found highly offensive.  I was informed Theresa Leo sued the department, and reached a settlement.  In addition, there are also at least two attendings who feel Dr. Bahnson is trying to actively destroy their careers who would probably speak out about him if they didn't feel he would ruin their academic careers.  Dr. Bahnson also has alienated many of the other medical subspecialties from interacting with the Ohio State Department of Urology.  He has been completely unprofessional in his behavior towards Ohio State's single genitourinary pathologist, Dr. Debra Zynger.  He has bereted her on several occasions for no reason, and used sexist comments to and about her. I was told she reported him to the Medical Center, and Dr. Bahnson was required to take anger management counseling.  Dr. Bahnson in 2011 ordered all the residents and attendings in urology to ostracize Dr. Zynger, by refusing to speak to her.  When we informed Dr. Bahnson we had to communicate with her,  because she was the only certified genitourinary pathologists at the University, he became irate.  Dr. Zynger stopped giving genitourinary pathology lectures to the Urology Department due to the behavior of Dr. Bahnson, and who could blame her?  There are similar issues with the Medical Oncology Department due to Dr. Bahnson; one attending in particular pulled me aside in 2013 to discuss his concerns with Dr. Bahnson and asked what could be done about it.

These residents, staff, and attendings, including myself, do not come forward due to extreme intimidation.  They are worried they will lose their jobs, reputation, ability to practice medicine, ability to be board certified, or worse.  Who can blame them given Dr. Bahnson's history and threats?  Dr. Bahnson's behavior is meant to foster that fear, so he can continue to behave in this manner. In the past 5.5 years, our small program has had 7 residents quit, be fired, or have to undergo inpatient psychiatric evaluation.  Some residents have had both psychiatric evaluation, and then quit or were fired. Many other residents, including myself, have been close to leaving the program.  I have also been informed there are possibly two other graduated residents who Drs. Bahnson and Box interfered with their ability to obtain hospital credentialing and certification.

One of my biggest concerns is Dr. Bahnson's reaction to the ACGME survey results and ACGME actions against his program.  Every time there is an adverse survey result or action from the ACGME, Dr. Bahnson institutes a "reign of terror" to try to prevent future residents' cries for help.  I have been told by an attending physician that at the faculty meeting on Monday 7/7/14, just before Dr. Bahnson tried to prevent his three chiefs from sitting for the urology boards, Dr. Bahnson used the exact words "reign of terror" to describe how he was going to intimidate the residents into never defying him again. I know the faculty would have to verify he promised a "reign of terror" if they were to be honest and free from retribution from Dr. Bahnson.  These were not merely words, as he acted on them immediately.  The ACGME had a site visit to Ohio State Department of Urology in May 2014.  This site visit was prompted by several years of very poor resident responses on ACGME surveys.  In particular, on the last survey, 83% of residents responded they were intimidated, and the vast majority said there was no way to confidentially bring up concerns without retribution.  There were other concerns brought up on the survey as well.  I assure you the poor responses on the ACGME surveys over the past several years are actually a cry for help from the residents, and are due to Dr. Bahnson's outlandish behavior.  I know several if not many residents mentioned Dr. Bahnson specifically was the problem to the ACGME site reviewers.  The ACGME site visitors said to me they knew Dr. Bahnson was the problem.

I was told Dr. Bahnson was notified the ACGME had given him and the program an official warning on Friday 6/27/14.  Since then, he has instituted his "reign of terror."  Just after the May 2014 ACGME site visit, Dr. Bahnson and Dr. Box took away the ability for the chief residents to make the urology schedule to pick their own operative cases, in retaliation to the ACGME site visit and a request

to attend a pediatric visiting professor.   He came after my chief class, who I believe he incorrectly feels spearheaded the effort for bad ACGME survey results and the ACGME warning he received.  He also has started aggressively intimidating the junior residents, sending emails to the incoming PGY-2s that their "predecessors have angered him" and that they had better be careful.  I saw this email, as the PGY-2s forwarded it to me.  He made all three incoming PGY-2s send him an email confirming they received this email.  He sent another aggressive email to all the upper level residents and faculty of the same concept. Dr. Bahnson is also having all the residents meet individually with him to discuss "professionalism," after reading an article of his choosing.   This would normally be a good thing, but this is really just another veiled threat, and example of how he uses professionalism and ethics as a weapon.

His new "reign of terror" is a more severe form of his prior "reign of terror," after the first negative ACGME survey and adverse action in 2011.  He blamed the residents for the results, said we were "bad residents" who he needed to extirpate, and then proceeded to use ethics and professionalism to intimidate.  I believe he feels he cannot be stopped, after he was given a 4 year chairmanship renewal in late June 2014 by Ohio State University Medical Center.  It is also shocking he is on ethics committees, highly respected boards, writes essays on ethics for urology journals and publications, and serves on the ABU to decide if diplomats are ethical and professional, all of this with his blatantly inappropriate behavior. I told the ACGME site visitor who visited in May 2014 I felt concerned Dr. Bahnson would try to prevent me from becoming board certified, and would eventually try to ruin my urological career due to this ACGME site visit.  The site visitor said Dr. Bahnson did not have the power to accomplish this.  However, Dr. Bahnson has started the process of doing just that. This behavior on Dr. Bahnson's part is the exact type of malicious intimidation and retaliatory behavior the residents are answering negatively about on the ACGME survey year after year.

Another particularly concerning problem is Program Director Dr. Box does very little to advocate for residents when these violations are occurring.  The residents mentioned to the ACGME in 2011 we wanted a new Program Director, as the Program Director was Dr. Bahnson at the time.  After some time, Dr. Bahnson appointed Dr. Box to this role, although other current faculty who seemed to be better choices expressed interest, such as Dr. David Sharp.  Dr. Box did change resident rotations for the PGY-4s and chiefs to two months from four months, at the request of the residents.  He also advocated for the PGY-4s to attend the board review course in New Orleans, and is more receptive to paternity leave and following OSU employment protocol than his predecessor.  However, he is still completely under the control of Dr. Bahnson.  Dr. Bahnson says the residents are to have less conference time; Dr. Box carries it out.  Dr. Bahnson says to remove the ability for the chiefs to make the schedule; Dr. Box sends the email.  Dr. Bahnson says to pull the letter at the ABU one business day before the test so his chief residents' careers and personal lives are in jeopardy; Dr. Box does it.  Dr. Bahnson says there will be a reign of terror; Dr. Box helps institute it.  I sent Dr. Box an email begging him to reinstitute my letter to the ABU on Saturday, 7/12/14.  I told him the multiple ways it was going to adversely impact me, and that I hadn't received any due process or any warning.  I was given no chance to defend myself, and there had been zero communication to me about this from the Department of Urology.  I pleaded with him to right this injustice, as the ABU told me he could.  I heard no response from Dr. Box.  Moreover, the residents have just been informed Dr. Bahnson is taking over all credentialing responsibilities from Dr. Box for graduated residents, effective 7/1/14.  Unfortunately, it is apparent Dr. Box is just Program Director in name only.

Dr. Bahnson's behavior is wildly unprofessional and unethical.  He attempts to prevent competent urologists from succeeding and obtaining certification. He will stop at nothing for revenge, and uses concepts like ethics, professionalism, and core competencies as his weapons to enact his

vengefulness. There is no doubt in my mind he will interfere in my ability to take and pass the oral urology boards in 1.5 years, and also will interfere with other urology residents' ability to succeed, as he has done multiple times previously. Dr. Bahnson uses intelligence, cunning, his national and regional influence, and numerous positions of power to manipulate, intimidate, and make others under him miserable. I have witnessed two very different sides to Dr. Bahnson. On the one side he is a seemingly esteemed, articulate and a charismatic individual who constantly discusses and writes on professionalism and ethics. On the other side, he maliciously abuses his power, preying on those below him with his self-serving schemes to convince others to follow him. His behavior is so far beyond an "old school" or "tough" chairman; it is completely unethical and unprofessional. I'm so sorry I didn't come forward earlier and should have, but the fear and intimidation for my career, my family including my two young children, and my fellow residents prevented it. Many other attendings, residents, and staff feel the same way, and desperately want to tell their story, but do not and have not due to extreme fear.

-Jeffrey Wilson, M.D.
Graduated resident
Ohio State University Department of Urology
Email: █████████████████████
Phone: █████████████

cc:     Edmund Funai, M.D.